**EMERY WORLDWIDE AIRLINES, INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee,**

and

**Federal Express Corporation, Defendant–Appellee.**

No. 01–5075.

United States Court of Appeals, Federal Circuit.

DECIDED: Aug. 31, 2001.

Frederick W. Claybrook, Jr., Crowell & Moring LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was W. Stanfield Johnson. Of counsel on the brief were David P. Hendel, and Claude P. Goddard, Jr., Wickwire Gavin, P.C., of Vienna, Virginia.

Kyle Chadwick, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee United States. With him the brief were Stuart E. Schiffer, Acting Assistant Attorney General; and David M. Cohen, Director. Of counsel on the brief was Eric Scharf, Managing Counsel, U.S. Postal Service, of Washington, DC. Of counsel was Mark A. Melnick, Attorney.

David S. Cohen, Cohen Mohr LLP, of Washington, DC, for defendant-appellee Federal Express Corporation. Of counsel on the brief was Connie Lewis Lensing, Federal Express Corporation, of Memphis, Tennessee.

Before NEWMAN, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and GAJARSA, Circuit Judge.

## DECISION

GAJARSA, Circuit Judge.

On January 10, 2001, the United States Postal Service ("USPS") awarded Federal Express Corp. ("FedEx") a seven-year contract valued at approximately $6.36 billion. Under the provisions of this contract, FedEx agrees to provide air transportation network services to deliver the USPS's Express, Priority, and First Class mail. The USPS negotiated this contract with FedEx on a "sole-source" basis; that is, the USPS did not solicit competitive bids. Emery Worldwide Airlines, Inc. ("Emery"), an air transportation provider that currently transports postal mail under certain air service contracts with the USPS, filed an action in the United States Court of Federal Claims ("Court of Federal Claims" or "trial court") contesting the USPS–FedEx contract award. After determining that it had subject matter jurisdiction, the trial court granted the government's motion for summary judgment upholding the contract and denied Emery's cross-motion for summary judgment, *Emery Worldwide Airlines, Inc. v. United States*, 49 Fed.Cl. 211 (2001). We affirm.

## BACKGROUND

The USPS currently uses a piecemeal system of "dedicated" air transportation networks to deliver Express, Priority, and First Class mail.[1] A "dedicated" network uses aircraft that are operated *exclusively* for the transportation of a single customer's parcels, the USPS's mail in this case. Emery currently operates a fleet of dedicated aircraft under contracts with the USPS. At least six other dedicated system air transportation providers also currently carry Express, Priority, or First Class mail. Some First Class mail is also carried on non-dedicated commercial aircraft.

The USPS recognized that dedicated networks are inefficient and expensive. It also realized that commercial aircraft failed to deliver over 40% of postal mail on time. Therefore, the USPS sought to contract with a single air transportation provider that could provide a "shared" (or "shared-lift") system in which the provider would reliably, effectively, and affordably carry postal mail. A "shared" system aircraft provides transportation services for more than one customer. Such a system allows the USPS to take advantage of economies of scale, paying for only a portion of operating and overhead costs. A shared system also relieves the USPS from paying for an entire plane flight to a particular destination when it only requires transportation of a small amount of mail; in other words, a shared-lift system allows the USPS to "piggy-back" on a plane that already flies on a particular route.

In August 2000, the USPS hired PricewaterhouseCoopers, LLP ("PwC") to conduct a market assessment of the air transportation industry. With assistance from MergeGlobal, Inc., PwC developed an analysis (the "PwC Analysis"), which is dated January 7, 2001. In the Analysis, PwC used publicly available data to assess several carriers potentially available for the single-provider contract.[2]

By autumn, 2000, it was clear that the USPS was seriously considering awarding

---

1. Express mail is delivered overnight to most cities and is guaranteed within two days. Priority mail is delivered in two to three days to most cities, but has no guarantee. First class mail is intended to be delivered within two to four days to almost every city.

2. These sources include SEC filings, Dow Jones Interactive, websites, JP Fleets database, the "Official Airline Guide," and Aviation Week magazine.

a contract to FedEx to provide the mail transportation services at issue. Indeed, on September 7, 2000, Postmaster General William Henderson held a press conference on the topic of "FedEx Strategic Alliance Discussions." At the end of the year 2000, the USPS had developed a transportation agreement with FedEx on a sole-source basis. The USPS never sought competitive bids from other carriers; rather it negotiated solely with FedEx.

On January 5, 2001, Emery filed an action in the Court of Federal Claims and moved for a temporary restraining order to enjoin the USPS from awarding a contract to FedEx for transportation of Express, Priority, and First Class mail. FedEx entered the case as an intervenor. The USPS moved to dismiss the case on three grounds: (1) Emery lacked standing because it was not an "interested party;" (2) the Court of Federal Claims lacked subject matter jurisdiction because the USPS is not a "federal agency" for purposes of the Tucker Act; and (3) the Court of Federal Claims lacked jurisdiction because the action could not be brought against the USPS in its own name. The trial court allowed Emery to amend its complaint to name the United States as a defendant and determined that Emery is an "interested party." The court deferred ruling on whether it possessed Tucker Act jurisdiction.

During a hearing on January 8, 2001, the United States presented a document entitled: "Justification for Noncompetitive Purchase with Federal Express Corporation" ("Justification"), which was signed on January 7, 2001 on behalf of the USPS. The Justification outlines nine USPS requirements for transporting Express, Priority, and First Class mail. These re-

quirements include, *inter alia:* ability to decrease the USPS's reliance on dedicated aircraft and move toward a shared-lift network; nationwide coverage capacity; strong financial stability that is not overly dependant on the USPS for its total livelihood; and an infrastructure capable of tracking parcels. The Justification emphasizes the USPS's preference for a contractor that can provide a shared-lift network that will decrease its current operating costs and overhead outlays.

The Justification also describes options the USPS had under its internal guidelines, the "Purchasing Manual," for procedures it could use to purchase transportation services. One option available was an open, competitive bidding procedure. Based on its extensive experience in awarding competitively bid contracts, the USPS in its Justification explained that such a procedure was not feasible for the contract at issue. The USPS indicated that competitive bidding would take between one and two years and would require substantial expenditures to design an appropriate network for each viable competitor before it could establish a definitive basis for pricing. The Justification also provided that under the Purchasing Manual, instead of conducting a competitive bidding procedure, the USPS could select a single supplier and negotiate a contract with it.[3] This negotiation procedure was followed by the USPS in developing the contract with FedEx.

The Justification then indicates that six carriers, including Emery and FedEx, had existing national air networks potentially large enough in geographical scope to perform the contract for Express, Priority, and First Class mail. As evidenced by the Justification, the USPS considered

---

**3.** The USPS recognized that it was permitted under the Purchasing Manual to use publicly

available information to select the single supplier.

each of these potential providers. In describing Emery, the USPS noted that Emery possesses a fleet of only eighty-seven planes, which are on average thirty-one years old and are likely to depreciate rapidly and require significant maintenance costs. The USPS also indicated that it was unlikely Emery could meet the USPS requirements at a cost-effective price without relying on USPS payments for a significant portion of its revenue. The USPS further recognized that Emery has only one-third of the daytime flight capacity required by the USPS and only flies to sixty cities (only sixty percent of which overlap with the existing USPS network) although the USPS required transport to at least sixty-five cities.

After analyzing all six carriers, including Emery and FedEx, the USPS in the Justification remarked that FedEx is "uniquely situated" to meet the USPS's needs. Further, the Justification concludes that a "non-competitive award to FedEx is so compelling that competition . . . would not be in the best interests of the [USPS]."

The USPS attached the PwC Analysis to the Justification as an appendix. In its Analysis, PwC screened out potential suppliers that did not meet particular USPS requirements. These requirements were categorized into seven "filters," which closely mirror the Justification requirements. Emery was "filtered" from consideration after the second filter—national geographic scope, which considers number of airports served, airport overlap with the existing USPS network, and ability of a carrier to cost effectively serve additional airports. After the sixth filter in the PwC Analysis, only FedEx remained. Accord-

ingly, both the USPS in the Justification and PwC in its Analysis determined that FedEx is best suited to meet the USPS's needs for the contract at issue. Notably, the PwC Analysis also demonstrates that Emery possesses a very small market share of non-postal goods transport services compared to FedEx and other air shipping companies.

On January 8, 2001, JP Morgan Securities, Inc. ("JP Morgan"), which was hired by the USPS's Board of Governors (the "Board"), presented a report to the Board finding that the transportation agreement contemplated by the USPS and FedEx is fair and achieves the USPS's objectives. The JP Morgan report also confirms that over the seven-year contract period, the USPS will save approximately $1.358 billion by using a FedEx shared-lift system rather than its current piecemeal network.

On January 9, 2001, the Court of Federal Claims entered an order denying Emery's application for a temporary restraining order and formalizing its earlier ruling that Emery is an "interested party" that has standing to bring suit. The USPS awarded FedEx the contract on January 10, 2001.[4] A synopsis of the contract was placed in the Commercial Business Daily ("CBD") on February 15, 2001.

Emery amended its complaint on January 16, 2001; it sought a declaratory judgment to set aside the contract and an injunction to stop performance under the contract. Emery alleged that the USPS violated the Administrative Procedure Act ("APA") and pointed to no fewer than ten alleged defects in the procurement process.[5] Emery and the United States filed cross-motions for summary judgment.

4. The agreement is based on two separate contracts, one for air transportation and one for retail services.

5. Emery alleged that the arrangement between the USPS and FedEx is anti-competitive and a restraint of trade. On January 18, 2001, FedEx moved to dismiss this count as beyond Court of Federal Claims jurisdiction.

The Court of Federal Claims first determined that it possessed jurisdiction over this suit. It next stated that in accordance with the Tucker Act, 28 U.S.C. § 1491(b)(4), the Court of Federal Claims reviews award procurement protests under APA review standards. Under that standard, the trial court indicated that an award could be set aside only if the decision lacked a rational basis or if it involved a prejudicial violation of a regulation or procedure.

The trial court next addressed whether the USPS violated 39 U.S.C. § 101(f), which provides: "In selecting modes of transportation, the [USPS] .... shall make a fair and equitable distribution of mail business to carriers providing similar modes of transportation to the [USPS]." The trial court determined that the USPS did not violate § 101(f) because that provision contemplates a sole-source award to a single provider. The trial court then indicated that competitive bidding is not required under § 101(f) because 39 U.S.C. § 5402(d) and the USPS Purchasing Manual allow the USPS to award sole-source contracts.

The trial court next examined 39 U.S.C. § 5005(b)(3) and indicated that the USPS violated the statute's plain language, which requires that a contract between the USPS and a carrier be made available for public inspection at least fifteen days prior to the effective date of the contract. Nonetheless, the court determined that § 5005(b)(3) does not apply to domestic contracts. The trial court noted that § 5005(b)(3) was enacted in 1970 while the Civil Aeronautics Board ("CAB") maintained rate-setting responsibilities and after the 1984 CAB Sunset Act, Pub.L. No. 98–443, 98 Stat. 1703 (1984), the USPS was authorized to use competitive bidding or negotiations in place of CAB rate-setting.

Therefore, the trial court determined that the original purpose of the § 5005(b)(3) publication requirement—to ensure uniformity of terms—ceased to exist when the CAB was divested of rate-setting responsibility. Consequently, citing Justice Kennedy's concurrence in *Public Citizen v. United States Department of Justice*, 491 U.S. 440, 470, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring), the trial court determined that the plain language of the statute would lead to "patently absurd consequences" that "Congress could not possibly have intended" and therefore concluded that § 5005(b)(3) did not bind the USPS.

The trial court also addressed Emery's assertion that the USPS violated provisions in the USPS Purchasing Manual by failing to synopsize the non-competitive purchase in the CBD prior to awarding the contract. The USPS and FedEx argued that pre-award publication in the CBD was not required by the Purchasing Manual and that its post-award publication in the CBD satisfied the Manual's strictures. Based on the plain language of the provisions, the trial court determined that the CBD synopsis must be publicized prior to the contract award. Nonetheless, applying an APA standard of review similar to APA review in a bid protest case, the trial court refused to set aside the contract because Emery failed to establish that violation of the Purchasing Manual's publication requirement prejudiced Emery.

The trial court next reviewed numerous arguments directed to establishing that the USPS's decision lacked a rational basis. The court indicated that it would review these types of claims under the APA rational basis standard of review used in bid protest cases. The trial court recognized that the USPS did not engage

The trial court, by order dated January 23, 2001, granted FedEx's motion.

PwC to conduct an interactive process; rather it noted that the USPS had a sole-source award to FedEx as an objective and PwC's task was to justify it. Nonetheless, after considering each allegation made by Emery in great detail, the trial court determined that Emery failed to establish that the USPS's decision to contract with FedEx on a sole-source basis lacked a rational basis.

After addressing the merits of Emery's claim, the trial court considered the balance of the harms and the public interest and entered judgment for the United States and FedEx, denying Emery injunctive relief to halt performance of the USPS–FedEx contract and declaratory relief to set aside the contract. In conclusion, the Court of Federal Claims denied the government's motion to dismiss for lack of jurisdiction, denied Emery's cross-motion for summary judgment, and granted the government's motion for summary judgment, dismissing the complaint and ordering judgment for the United States and FedEx. This appeal followed the aforementioned events.

## DISCUSSION

### A. Jurisdiction

■ The breadth of jurisdiction in the United States Court of Federal Claims is a legal question that this court reviews *de novo*. *RAMCOR Servs. Group v. United States*, 185 F.3d 1286, 1288 (Fed.Cir.1999).

The history of judicial review of government contracting procurement decisions is both long and complicated. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1330–33 (Fed.Cir. 2001). In 1940, the Supreme Court in *Perkins v. Lukens Steel Co.*, 310 U.S. 113,

60 S.Ct. 869, 84 L.Ed. 1108 (1940), held that aggrieved protesters lacked standing to challenge government contract awards in federal courts. The *Perkins* Court reasoned that the Public Contracts Act of 1936 was designed solely to protect the government. *Id.* at 125, 60 S.Ct. 869. That is, the Supreme Court determined that disappointed potential contractors had no standing because they suffered no legally cognizable injury.

After *Perkins*, government contract procurement cases were brought in the Court of Federal Claims on a limited basis under a theory that the government made an implied contract with prospective bidders to fairly consider their bids.[6] *Heyer Prods. Co. v. United States*, 135 Ct.Cl. 63, 140 F.Supp. 409 (1956). This venue was available because the Tucker Act granted the Court of Federal Claims jurisdiction over claims founded on implied contracts with the United States, 28 U.S.C. § 1491(a). Prior to 1982, Court of Federal Claims review was narrow and an aggrieved party was typically limited to monetary relief. *Impresa*, 238 F.3d at 1331. In 1982, Congress enacted the Federal Courts Improvement Act of 1982 ("FICA"), Pub.L. No. 97–164, § 133(a), 96 Stat. 25, 40 (1982), which, *inter alia*, granted the Court of Federal Claims jurisdiction to provide declaratory and injunctive relief. *Id.* In 1983, however, the Federal Circuit limited Court of Federal Claims jurisdiction in government procurement actions to cases brought before a contract is awarded. *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir.1983) (en banc).

Following passage of the APA in 1946, the District of Columbia Circuit in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d

---

**6.** Prior to 1992, the Court of Federal Claims was the United States Claims Court; prior to 1982, the court was the United States Court of Claims. For the sake of simplicity, we refer to the court as the Court of Federal Claims.

859 (D.C.Cir.1970), held that government contract procurements were reviewable in federal district courts. The *Scanwell* court determined that standing to challenge agency actions was grounded in the judicial review provisions of the APA.

In 1996, Congress passed the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, 110 Stat. 3870 (1996). This statute provides in part:

> Both the Unties [sic] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a *Federal agency* for bids or proposals for a proposed contract or *to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement.* Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (Supp. V 1999) (emphasis added). This statutory provision allowed both federal district courts and the Court of Federal Claims to hear "the full range of cases previously subject to review in either system." 142 Cong. Rec. S11849 (daily ed. Sept. 30, 1996) (statement of Sen. Levin).

■ Yet, to prevent forum shopping and to promote uniformity in government procurement award law, Congress sought to channel the entirety of judicial government contract procurement protest jurisdiction to the Court of Federal Claims.[7] Therefore, as part of the ADRA, Congress enacted a sunset provision, which terminated federal district court jurisdiction over bid protests on January 1, 2001. Pub.L. No. 104–320, § 12(d), 110 Stat. at 3875. It is clear that Congress's intent in enacting the ADRA with the sunset provision was to vest a single judicial tribunal with exclusive jurisdiction to review government contract protest actions. Senator Cohen, who offered the provision at issue, described the ADRA's intended impact on jurisdiction:

> [The legislation] is designed to increase the efficiency of our procurement system by consolidating jurisdiction over bid protest claims in the Court of Federal Claims. The [legislation] would reverse the decision of the D.C. Circuit in *Scanwell* .... Providing district courts with jurisdiction to hear bid protest claims has led to forum shopping and the fragmentation of [g]overnment contract law. Consolidation of jurisdiction in the Court of Federal Claims is necessary to develop a uniform national law on bid protest issues and end the wasteful practice of shopping for the most hospitable forum. Congress established the Claims Court—now the Court of Federal Claims—for the specific purpose of improving the areas of ... [g]overnment contracts.... *Scanwell* jurisdiction frustrates this purpose and deprives litigants of the substantial experience and expertise the Court of

---

**7.** The General Accounting Office ("GAO"), an Article I administrative forum, may review procurement protests, but such review does not exclude judicial review. 31 U.S.C. §§ 3551–3556 (Supp. V 1999). The GAO's protest jurisdiction is defined by the Competition in Contracting Act ("CICA") of 1984, 31 U.S.C. § 3551 *et seq.* The USPS is exempted from all federal procurement laws not specifically enumerated in 39 U.S.C. § 410(a). *United States v. Elec. Data Sys. Fed. Corp.,* 857 F.2d 1444, 1446 (Fed.Cir.1988). Because the CICA is not specifically enumerated in 39 U.S.C. § 410(a), the CICA does not apply to the USPS and therefore the USPS is not subject to GAO review.

Federal Claims has developed in the [g]overnment contracting area.

142 Cong. Rec. S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen).

■ Senator Levin, who introduced the ADRA legislation, recognized that the sunset provision applied not only to bid protests, but to procurement protests in general: "After 4 years, the jurisdiction of the district courts would terminate, and the Court of Federal Claims would exercise judicial jurisdiction over *procurement protests*." 142 Cong. Rec. S11849–50 (daily ed. Sept. 30, 1996) (statement of Sen. Levin) (emphasis added). Consequently, it is clear that the Court of Federal Claims is the only judicial forum to bring any governmental contract procurement protest. *See Novell, Inc. v. United States*, 109 F.Supp.2d 22, 24–25 (D.D.C.2000) ("[T]here is no longer … APA-based jurisdiction for the district courts in government bid protest cases; rather Congress effectively subsumed APA jurisdiction of the district courts into the more specific jurisdictional language of the ADRA.").

The United States contends that it is not subject to Court of Federal Claims jurisdiction because the USPS is not a "federal agency" as specified by the ADRA, 28 U.S.C. § 1491(b)(1). That section gives the Court of Federal Claims jurisdiction over actions objecting to proposed or actual contract awards "by a federal agency." While Title 28 of the United States Code does not define "federal agency," it does define "agency":

As used in this title: … . The term *"agency" includes any* department, *independent establishment,* commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, *unless context shows that such term was intended to be used in a more limited sense.*

28 U.S.C. § 451 (Supp. V 1999) (emphasis added). Nothing in § 1491(b)(1) indicates that this definition of "agency" does not apply in determining whether a government entity is a "federal agency" under § 451. Further, § 451 dictates that an "agency" for purposes of Title 28 must be within the domain of the United States. Accordingly, "federal agency" as used in 28 U.S.C. § 1491(b)(1) falls within the ambit of "agency" as used in 28 U.S.C. § 451. Consequently, we must consider whether the USPS is an "agency" under § 451.

The Postal Reorganization Act of 1970, Pub.L. No. 91–375, 84 Stat. 719 (1970), created the USPS to replace the former Post Office Department. *Butz Eng'g Corp. v. United States*, 204 Ct.Cl. 561, 499 F.2d 619, 620 (1974). The USPS is statutorily defined as an "independent establishment of the executive branch of the United States." 39 U.S.C. § 201 (1994). Section 451 indicates that an independent establishment of the United States is an "agency" for purposes of 28 U.S.C. § 451.

Indeed, one of our predecessor courts in *Butz*, in the course of examining Tucker Act jurisdiction over the USPS in a pre-ADRA government contract case, noted that by creating the USPS, "Congress … in no way intended to strip [the Post Office Department] of its public service character." 499 F.2d at 624. To determine whether the court had Tucker Act jurisdiction under the theory of an implied contract with the USPS, the *Butz* court examined "agency" as used in 28 U.S.C. § 451 (1970), which is identical in pertinent part to the current § 451.

In sum, the USPS is a § 451 "agency," and consequently is a "federal agency" for purposes of 28 U.S.C § 1491(b)(1), unless *"context* shows that such term was intended to be used in a more limited sense," 28 U.S.C. § 451 (emphasis added).

■ Under Supreme Court jurisprudence, it is clear that we may only consider statutory text in construing the statutory term "context." In *Rowland v. California Men's Colony*, 506 U.S. 194, 199, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993), the Supreme Court discussed 1 U.S.C. § 1 (1958), which provides: "In determining the meaning of any Act of Congress, unless the context provides otherwise ... the word 'person' includes...." The *Rowland* Court stated that " '[c]ontext' here means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts...." 506 U.S. at 199, 113 S.Ct. 716. It continued: "If Congress had meant to point further afield, as to legislative history, for example, it would have been natural to use a more spacious phrase, like 'evidence of congressional intent,' in place of 'context.' " *Id.* at 200, 113 S.Ct. 716. In *Hubbard v. United States*, 514 U.S. 695, 700–01, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995), the Supreme Court similarly indicated that statutory text alone should be used to interpret the word "context" in the portion of 18 U.S.C. § 6 that provides: "The term 'department' means one of the executive branches enumerated in section 1 [now § 101] of Title 5, *unless context shows that such term was intended to be used in a more limited sense.*" (emphasis added). The emphasized statutory language is identical to the "context" clause at issue in 28 U.S.C. § 451. Interpreting this language, the *Hubbard* Court quoted *Rowland* for the proposition that the text of congressional acts alone should be used to determine the context, and then stated: "Review of other materials is not warranted." *Id.* at 701, 115 S.Ct. 1754.

■ In light of *Rowland* and *Hubbard,* it is clear that to determine whether "context" shows that the term "agency" was intended to be used in a more limited sense than described in § 451, only statutory text may be considered. Neither the statutory text surrounding the word "context" in 28 U.S.C. § 451 nor the text of any related congressional act clearly indicates that "agency" was not meant to include the USPS. Indeed, the *Butz* court determined that "the context of the [Postal] Reorganization Act does not require a limited reading of the term 'independent establishment' for our jurisdictional purposes." 499 F.2d at 624. Consequently, the USPS is a § 451 "agency" and a "federal agency" for purposes of 28 U.S.C. § 1491(b)(1).

The United States also argues that procurement protest jurisdiction history prevents the Court of Federal Claims from exercising jurisdiction over pre-award government contract procurement protests involving the USPS, such as the one at issue.[8] The government points out that Senator Levin indicated that the ADRA would give "[e]ach court system [district courts and the Court of Federal Claims] ... jurisdiction over the full range of bid protest cases *previously* subject to review in either system." 142 Cong. Rec. S11849 (daily ed. Sept. 30, 1996) (statement of Sen. Levin) (emphasis added). The United States argues that prior to the passage of the ADRA, the Court of Federal Claims could not hear this case because Emery did not submit a bid and Court of Federal Claims jurisdiction prior to passage of the ADRA, which rested on an implied contract theory, required bid submission.[9]

---

**8.** Emery filed suit and moved to enjoin the contract award at issue on January 5, 2001. The contract was awarded to FedEx on January 10, 2001. Therefore, this case involves a pre-award procurement protest. *Cf. Grimberg,* 702 F.2d at 1365 (finding a post-award

suit because the complaint was filed after award of the contracts).

**9.** Similar to the *Impresa* court, 238 F.3d at 1332 n. 6, we decline to address whether implied contract theory survives the ADRA.

The United States then asserts that prior to passage of the ADRA, federal district courts did not have *Scanwell* jurisdiction over the USPS because *Scanwell* review is premised on the APA and 39 U.S.C. § 410(a) specifically exempts the USPS from the APA. Section 410(a) provides:

Except as provided by subsection (b) of this section, and except as otherwise provided in this title or insofar as such laws remain in force as rules or regulations of the Postal Service, *no Federal law* dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, *including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Postal Service.*

(emphasis added). Judicial review under the APA is specifically described in chapter 7 of title 5. Accordingly, the government argues that because pre-ADRA district court jurisdiction was premised on APA review and because 39 U.S.C. § 410(a) purports to exempt the USPS from APA review, *Scanwell* jurisdiction could not lie had this case been brought to a district court prior to passage of the ADRA.[10] Consequently, the government argues that prior to enactment of the ADRA neither the Court of Federal Claims nor federal district courts could have possessed jurisdiction over the suit at issue and therefore, it contends that the Court of Federal Claims does not now have jurisdiction over this suit.

The government assumes that prior to enactment of the ADRA, *Scanwell* jurisdiction was available in district courts for both pre and post-award government procurement cases. Therefore, the government cannot properly argue that prior to enactment of the ADRA, no pre-award cases could be brought in district courts.[11]

---

**10.** This court's predecessor in *Butz*, 499 F.2d at 626, indicated that 39 U.S.C. § 410(a) *does not refer to* procedure and *jurisdiction*, but rather simply refers to the USPS's discretion to contract according to its own needs and regulations. Yet, the *Butz* court was referring to jurisdiction under the Court of Claims's general jurisdiction statute, 28 U.S.C. § 1491 (Supp. II 1972), not personal jurisdiction in the context of standing that was at issue in *Scanwell*. The Supreme Court has also stated that the judicial review provisions of the APA are not jurisdictional. *Califano v. Sanders*, 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). This case, however, also refers to subject matter jurisdiction rather than personal jurisdiction.

**11.** Under *Scanwell*, federal district courts possessed jurisdiction over post-award protest cases. After *Scanwell* and prior to 1982, district courts also certainly possessed jurisdiction over pre-award government procurement protest suits, *see, e.g., Wheelabrator Corp. v. Chafee*, 455 F.2d 1306, 1309 (D.C.Cir.1971). After 1982 but prior to passage of the ADRA, however, it was unclear whether district courts possessed pre-award protest jurisdiction. In 1982, FICA was enacted, which pro-

vided: "To afford complete relief on any contract claim brought *before* the contract is awarded, the [Court of Federal Claims] shall have *exclusive* jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as deemed proper...." 28 U.S.C. § 1491(a)(3) (repealed 1996). Several circuits examined this statutory section, which was repealed by passage of the ADRA, and were split as to whether it divested district courts of pre-award *Scanwell* jurisdiction. The Fourth and Ninth Circuits (and the Second Circuit in *dicta*) determined that pre-award claims could only be brought in the Claims Court. *Rex Sys., Inc. v. Holiday*, 814 F.2d 994, 997–98 (4th Cir.1987); *Price v. United States Gen. Servs. Admin.*, 894 F.2d 323, 324 (9th Cir.1990); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 721 n. 4 (2d Cir.1983). The First and Third Circuits suggested that "exclusive" in § 1491(a)(3) meant exclusive of boards of contract appeals and that pre-award district court jurisdiction should not be disturbed. *Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1057–58 (1st Cir.1987); *Coco Bros. v. Pierce*, 741 F.2d 675, 678–79 (3d Cir.1984). The Federal Circuit in *Grimberg*, 702 F.2d 1362, strongly suggested that the legislative history underlying FICA

The government simply argues that prior to passage of the ADRA, district courts were not available for pre-award cases involving the USPS.

We need not decide whether, prior to passage of the ADRA, federal district courts possessed jurisdiction over pre-award procurement protests involving the USPS. The ADRA clearly states that the Court of Federal Claims has jurisdiction over "federal agenc[ies]" with respect to a "proposed award or the award of a contract." 28 U.S.C. § 1491(b)(1). The "normal understanding of [a statute's] bare language is not conclusive but it is entitled to prevail unless overcome by a persuasive showing from the purpose or history of the legislation." *Lutheran Mut. Life Ins. Co. v. United States*, 221 Ct.Cl. 77, 602 F.2d 328, 331 (1979). While the legislative history undergirding the ADRA indicates that the Court of Federal Claims was to gain traditional *Scanwell* jurisdiction, that history fails to state whether the USPS was subject to *Scanwell* jurisdiction in federal district courts prior to passage of the ADRA. Further, notwithstanding § 410(a), numerous courts have recognized that district court jurisdiction may be invoked to test the validity of a procurement decision made by the USPS. *See, e.g., Peoples Gas, Light & Coke Co. v. United States Postal Serv.*, 658 F.2d 1182, 1191 (7th Cir.1981) ("[T]he exemptions found in section 410 of the Postal Reorganization Act do not manifest a congressional intent to foreclose all judicial review of alleged violations by the Postal Service's procurement regulations."); *AT&T Corp. v. United States Postal Serv.*, 57 F.Supp.2d 522 (N.D.Ill. 1998); *Carter Chevrolet Agency, Inc. v.*

*United States Postal Serv.*, 19 F.Supp.2d 1246 (W.D.Okla.1997); *Express One Int'l Inc. v. United States Postal Serv.*, 814 F.Supp. 93 (D.D.C.1992); *Express One Int'l Inc. v. United States Postal Serv.*, 814 F.Supp. 87 (D.D.C.1992). *But see Concept Automation, Inc. v. United States Postal Serv.*, 887 F.Supp. 6 (D.D.C.1995) (determining that § 410(a) prevents USPS procurement decisions from judicial review).

■ "[T]he relevant inquiry [into legislative intent] is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was." *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 828, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). Neither the ADRA text nor its legislative history clearly exclude the USPS from present Court of Federal Claims jurisdiction. Further, in enacting the ADRA, Congress did not have a well established body of case law indicating that USPS procurement protests were not properly subject to district court jurisdiction under *Scanwell*. Therefore, without explicit Congressional direction regarding pre-ADRA *Scanwell* jurisdiction in cases involving the USPS, the language of § 1491 controls, which indicates that the Court of Federal Claims has jurisdiction over all government procurement protest cases, including those involving the USPS. Indeed, the government's position amounts to an argument that no judicial forum is available to review USPS pre-award government contract protests. Without express statutory language from Congress or clear legislative history for support, we refuse to twist 39 U.S.C. § 410(a) and 28 U.S.C. § 1491(b)—statutes originally en-

indicates that § 1491(a)(3) left untouched the powers of district courts in government contract cases, 702 F.2d at 1373, and hinted that "exclusive" meant "exclusive of contract boards." *Id.* at 1376. Nonetheless, the *Grimberg* court specifically stated that it did

not need to and would not decide whether district courts are denied jurisdiction over pre-award government contract procurement suits by § 1491(a)(3) because the *Grimberg* case involved a post-award suit. *Id.* at 1374, 1376.

acted twenty-six years apart—to find that no judicial body possesses jurisdiction to judicially review pre-award protests involving the USPS.[12]

Accordingly, the Court of Federal Claims possesses jurisdiction over the USPS in government procurement protest suits.

## B. Standard of Reviewing the USPS's Actions and Inactions

This case presents two novel questions regarding standard of review. First, we must determine whether to apply APA review to government procurement protests involving the USPS. Second, if we apply APA review, we must determine whether APA review of a sole-source award is identical to APA review of a bid protest action.

### 1. APA Review of USPS Procurement Protests

Section 410(a) of title 39 of the United States Code provides that except as explicitly provided for or insofar as federal laws remain in force as USPS rules or regulations, no federal law, including chapters 5 and 7 of title 5 of the United States Code,

applies to the USPS. Judicial review under the APA is specifically described in chapter 7 of title 5. 5 U.S.C. §§ 702–706. Therefore, 39 U.S.C. § 410(a) indicates that APA review does not apply to the USPS.

Conversely, the ADRA explicitly imports APA standards of review into the Court of Federal Claims's review of government contract procurement protests. 28 U.S.C.A. § 1491(b)(4) (Supp. V 1999) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). The legislative history of the ADRA makes clear that the Court of Federal Claims "applies the Administrative Procedure Act standard of review previously applied by the district courts (5 U.S.C. § 706) to *all* procurement protest cases...." *Impresa*, 238 F.3d at 1332 (emphasis added) (quoting H.R. Conf. Rep. No. 104–841, at 10 (1996)).

There is a conflict in the law. The trial court in this case failed to address this issue, as did the litigants—all assumed that if the Court of Federal Claims had jurisdiction, APA review applies.

---

**12.** We need not decide whether the Court of Federal Claims in this case possesses jurisdiction based on a finding that prior to enactment of the ADRA, the Court of Federal Claims could have heard this case. The government contends it could not have because Emery failed to submit a bid and the Court of Federal Claims only had jurisdiction over disappointed bidders under the implied contract theory governing pre-ADRA pre-award cases. The Court of Federal Claims's predecessor in *Standard Manufacturing Co. v. United States*, 7 Cl.Ct. 54 (1984) determined that it had jurisdiction under the implied contract theory, over a company that submitted statements of interest and capability to perform a sole-source contract, but did not receive the contract. The *Standard Manufacturing* decision was harshly criticized by this court in *Motorola, Inc. v. United States*, 988 F.2d 113, 115–16

(Fed.Cir.1993). The *Motorola* court found that a plaintiff that had been involved in the development of solicitation specifications, but did not submit a bid, could not bring suit in the Court of Federal Claims under the implied contract theory. The *Motorola* court stated that "the contractor's bid ... empowers the [g]overnment, upon acceptance, to bind the contractor to the terms of the solicitation" and "the manifestation of an intention to be bound warrants reading into the situation a reciprocal commitment from the [g]overnment, *i.e.*, a promise to fairly and honestly consider the contractor's bid." *Id.* at 116. We decline to decide whether the trial court would have had pre-ADRA jurisdiction over Emery, which did not submit a bid, in this pre-award sole-source contract case in light of *Motorola*.

In 1991, the Supreme Court had the opportunity to address whether Congress precluded APA review of USPS action by its enactment of 39 U.S.C. § 410(a). *Air Courier Conference of Am. v. Am. Postal Workers Union, AFL–CIO*, 498 U.S. 517, 522–23, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991). The Supreme Court, however, declined to decide this issue because the USPS raised it for the first time in its brief in opposition to the petition for writ of certiorari and it was not argued to or considered by either the federal district court or District of Columbia Circuit below. *Id.* at 522, 111 S.Ct. 913. In a footnote, the majority noted that this issue could be waived by the parties because it is not jurisdictional. *Id.* at 523 n. 3, 111 S.Ct. 913. The *Air Courier* Court then proceeded to decide the case based on standing to sue under the APA.

■ Similar to the Supreme Court in *Air Courier,* we decline to address the breadth of § 410(a). Each party before the trial court, in its briefs to this court, and at oral argument contended that if we found jurisdiction under the Tucker Act, APA review applies. Because the judicial review provisions of the APA are not jurisdictional, *Califano v. Sanders*, 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), and because the Court of Federal Claims possessed Tucker Act jurisdiction over this suit, both parties waived any arguments concerning the effect of § 410(a) on APA review. Consequently, we will apply the APA's review strictures in this case.[13]

## 2. APA Review of a Sole–Source Award

■ The APA provides that a reviewing court must set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (Supp. V 1999). Under this standard, the agency's action is entitled to a "presumption of regularity," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and the agency's action must be upheld as long as a rational basis is articulated and relevant factors are considered, *Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

■ Pursuant to these general precepts, the *Impresa* court clearly delineated the proper standard of review under the APA in a bid protest context. It stated that a bid award may be set aside if either: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332. "When a challenge is brought on the first ground ... the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of

---

**13.** Application of APA review is in step with Congress's vision of the public character of the USPS and with its desire for uniformity in government contract procurement protest law. H.R. Rep. No. 91–1104, at 19–20 (1970) ("The Postal Service is—first, last and always—a public service."); Sen. Rep. No. 91–912, at 3 (1970) ("[T]he system will work only if the public interest is kept as the paramount criterion in every decision made."); *Butz*, 499 F.2d at 623 ("The relevant legislative history indicates that ... Congress ... in no way intended to strip an overhauled [Post Office Department] of its public service character. Nowhere is mention made of decreased legal responsibility of the United States as a result of postal service revision."); 142 Cong. Rec. S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen) ("Consolidation of jurisdiction in the Court of Federal Claims is necessary to develop a uniform national law on bid protest issues....").

discretion and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1332–33 (citations omitted). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333. To establish prejudice in an action involving an alleged statutory or regulatory violation, a protester must show that absent the error, "there was a substantial chance it would have received the contract award." *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999); *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996).

▮▮▮▮ Identical review standards apply under the APA in the context of a sole-source award. *See Myers Investigative and Sec. Servs., Inc. v. United States,* 47 Fed. Cl. 605 (2000) (using bid protest jurisprudence under the APA in a sole-source award context); *Varicon Int'l v. Office of Pers. Mgmt.,* 934 F.Supp. 440, 444 (D.D.C. 1996) (indicating that a party that did not receive a sole-source contract "is analogous to ... a disappointed bidder" that under the APA, must demonstrate that the agency's sole-source award had no rational basis or involved a clear and prejudicial violation of applicable statutes or regulations). That is, a sole-source award may be set aside if either: (1) the sole-source award lacked a rational basis; or (2) the sole-source procurement procedure involved a violation of a statute, regulation, or procedure. *See Impresa,* 238 F.3d at 1332. Under the first ground, the party challenging the sole-source award bears a heavy burden of showing that the award decision had no rational basis, *see Bowman,* 419 U.S. at 285, 95 S.Ct. 438; *Impresa,* 238 F.3d at 1332; 5 U.S.C. § 706(2). To meet this burden, a disappointed party can show: (1) the agency's decision to

conduct a sole-source procurement process lacked a rational basis; (2) the agency's sole-source requirements lacked a rational basis; or (3) based on the sole-source requirements, the selection of the sole-source awardee lacked a rational basis. The test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion. *See Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (indicating that an agency must articulate a "rational connection between the facts found and the choice made"); *Impresa,* 238 F.3d at 1332.

▮▮▮ When a party contends that the procurement procedure in a sole-source case involved a violation of a statute, regulation, or procedure, it must establish prejudice by showing that it would have had a substantial chance of receiving the award, *see Statistica,* 102 F.3d at 1582. A disappointed party can establish prejudice either by showing: (1) proceeding without the violation would have made the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational, *see* 5 U.S.C. § 706; *Bowman,* 419 U.S. at 281, 95 S.Ct. 438, and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award, *see Alfa Laval,* 175 F.3d at 1367; or (2) proceeding without the violation, the complaining party would have a substantial chance of receiving the sole-source award, *see id.*

3. Rational Basis for Sole–Source Award to FedEx

▮▮▮ The USPS's decision to contract out its Priority, Express, and First Class mail on a sole-source basis was rational. The Justification demonstrates that the USPS considered conducting a competitive

bidding process for the contract at issue. The USPS rationally recognized, based on its previous experience, that a competitive bidding process would take much longer to perform than negotiating a sole-source award and would require the USPS to expend a great amount of resources to design appropriate potential networks with each viable competitor.

The Justification also provides insight into the rationality of the requirements the USPS sought in choosing a sole-source contractor. Prior to awarding FedEx the contract at issue, the USPS contracted primarily with multiple dedicated air transport carriers for delivery of Priority, Express, and First Class mail. The USPS recognized that this piecemeal system suffered from a myriad of deficiencies, including cost inefficiencies relating to operating procedures and overhead. It also realized that dedicated carriers tend to be less financially stable and more reliant on the USPS for financial viability than carriers capable of providing shared-lift. Further, the USPS recognized that the commercial airlines that currently transport some First Class mail are unreliable in achieving on-time performance. Appreciating these difficulties, the USPS set forth a number of characteristics that it sought in a carrier for the sole-source award. The primary characteristic the USPS desired was a single carrier that could provide shared-lift. The USPS rationally determined that unlike a primarily-dedicated system, in a shared-lift system, the USPS could purchase incremental space on carriers based on its needs. Such a shared system allows the USPS to reduce significantly operating and overhead costs arising from economies of scale and provides the USPS the ability to "piggy-back" on a plane already scheduled to travel a particular route. As a necessary component of a shared lift system, the USPS also sought a carrier that was not overly dependant on the USPS for

its financial livelihood. These requirements under which the USPS conducted its sole-source award decision were rational.

■ Finally, the USPS's decision to select FedEx as the sole-source awardee was rational as was its decision to exclude Emery from consideration for the contract. While the trial court determined that the USPS had the objective of awarding FedEx the contract and hired PwC to justify that decision, PwC's Analysis and the USPS's decision were nonetheless rational. Both the Justification and the PwC Analysis indicate that it was unlikely that Emery could meet the USPS's national network requirements at a cost effective price without relying on postal payments for a significant portion of its overall revenue. This adverse factor indicates that Emery could not provide a shared-lift system that would benefit the USPS. As support for eliminating Emery from consideration, the trial court pointed out that the publicly available information cited in the PwC Analysis showed that Emery does not maintain a substantial business carrying parcels other than postal mail. Based on Emery's small market share of non-postal parcel transport service, it was rational for the USPS to determine that Emery could not provide a substantial non-postal delivery system on which the USPS could largely "piggyback." Further, the PwC Analysis and Justification provide ample support, including recitation of market share of non-postal shipments, for the USPS's decision to select FedEx over Emery and companies that PwC considered more viable than Emery for this contract, such as Airborne Express and United Parcel Service.

None of the countless other arguments made by Emery attacking the rationality of the USPS's decision garner any weight.

### 4. 39 U.S.C. § 5005(b)(3) and the USPS Purchasing Manual

██ Emery contends that the USPS violated 39 U.S.C. § 5005(b)(3) and provisions in the USPS Purchasing Manual by failing to post adequately the contract and a synopsis of the contract, respectively. Even assuming *arguendo* that the USPS violated these requirements, Emery cannot establish prejudice.[14] Neither publication of the contract for public inspection nor a publication synopsizing the USPS's non-competitive purchase prior to the effective date of the contract would have affected the rationality of the USPS's decision to conduct a sole-source process or would have given Emery a substantial chance of procuring the contract, because the USPS rationally determined Emery could not meet its rational requirements.

### 5. 39 U.S.C. § 101(f)

Section 101(f) of title 39 provides:

In selecting modes of transportation, the Postal Service shall give highest consideration to the prompt and economical delivery of mail and shall make a fair and equitable distribution of mail business to carriers providing similar modes of transportation services to the Postal Service.

Emery argues that this statutory provision prohibits the USPS from awarding a contract for transportation of Express, Priority, and First Class mail to a single provider of transportation services. Alternatively, Emery contends that § 101(f) requires competition for the contract at issue.

By enacting the Postal Reorganization Act, Congress sought to untie the USPS's hands from the political strings that bound the old Post Office Department. H.R. Rep. No. 91–1104, at 13 (1970) ("There is widespread agreement that vestiges of 19th century political patronage practices have persisted in the Post Office Department too long and that one of the cardinal needs of postal reform is to seal the Postal Service from partisan political influence."); Sen. Rep. No. 91–912, at 8 (1970) ("The committee simply, and hopefully, recommends that politics in the Post Office be abolished and authorizes the postal service to insure the fulfillment of that policy."). In doing so, Congress endeavored to provide the USPS freedom to act in a business-like manner. H.R. Rep. No. 91–1104, at 5 (1970) ("Top management must be given authority ... to provide an efficient and economical postal system. Postal management has been severely and unjustly hampered in its efforts to administer the Department in a businesslike way."); *id.* ("Ultimately, the mails are completely dependant upon transportation. Yet, the Post Office Department today labors under restrictions on its ability to procure transportation services that are often rigidly confining and in some instances inexcusably archaic.").

██ To effectively and efficiently provide mail service in a business-like manner, the Postal Reauthorization Act provides the USPS with extensive flexibility in its transportation decisions. Sen. Rep. No. 91–912, at 19 (1970) ("The committee's primary motive is to improve postal service within the present regulatory framework, while at the same time affording the Postal Service more flexibility and economy in the transportation of mail by air."); *id.* at 17 ("In fashioning its recommendations on mail transportation, the committee balanced the undoubted need of the postal

---

**14.** Because Emery would not have been prejudiced even if the USPS failed to meet the requirements of § 5005(b)(3), we need not decide the effect that the CAB Sunset Act had on this statutory provision.

 

service for additional flexibility and greater economy against the need for improved mail service for all classes of mail."). Section 101(f) does not hinder this flexibility. Rather, § 101(f) simply requires that in selecting modes of transportation, procurement contract decisions be "fair and equitable." Fair and equitable distribution is not tantamount to "equal" distribution or distribution to multiple providers. Fairness and equity can be met by an award to a single entity.

Further, fair and equitable distribution does not necessitate a competitive bidding procurement process; this statutory provision can be met by a non-competitive, sole-source contract that is based on rational requirements in light of relevant data from several potential carriers. The USPS Purchasing Manual § 3.5.5.b also contemplates noncompetitive purchases under certain conditions, as does 39 U.S.C. § 5402, which provides: "The Postal Service may ... contract with any air carrier for the transportation of mail by aircraft in interstate air transportation either through negotiations or competitive bidding." Further yet, even if 39 U.S.C. § 101(f) required a competitive bidding procedure, Emery would not have had a substantial chance of winning the award because the USPS rationally determined it could not meet the USPS's shared lift requirement based on Emery's significant financial dependence on the USPS.

CONCLUSION

Because the contract between the USPS and FedEx was rational, and statutory and procedural violations, if any, did not prejudice Emery, the Court of Federal Claims's decision is

*AFFIRMED.*

COSTS

Costs are assessed against Emery.