# In the United States Court of Federal Claims

No. 11-217 C

(Filed January 29, 2013)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| INNOVATION DEVELOPMENT | * | Post-Award Bid Protest; 10 |
| ENTERPRISES OF AMERICA, | * | U.S.C. § 2304(c)(1)-(2) (2006); |
| INC., | * | 48 C.F.R. §§ 6.302-1, 6.302-2 |
| | * | (2009); Sole Source |
| Plaintiff, | * | Procurement; Only One |
| | * | Responsible Source; Unusual and |
| v. | * | Compelling Urgency; Standing; |
| | * | Lack of Advance Planning; |
| THE UNITED STATES, | * | Irrational Decision-Making; |
| | * | Violations of Procurement Laws |
| Defendant. | * | and Regulations. |
| * * * * * * * * * * * * * * | * | |

*Charles H. Crain*, Tulsa, OK, for plaintiff.

*Katy M. Bartelma*, United States Department of Justice, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Deborah A. Bynum*, Assistant Director, Washington, DC, for defendant.

_____

**OPINION AND ORDER**
_____

**Bush**, *Judge*.

_____

[1] None of the briefs filed in this case were filed under seal. Although a few pages of the administrative record were filed under seal, the court, in its citations to the record, has not disclosed any information that qualifies as "protected information" under the protective order entered in this case. For that reason, the court has determined that this opinion need not be filed under seal.

This post-award bid protest is before the court on the government's motion to dismiss filed under Rule 12(b) of the Rules of the United States Court of Federal Claims (RCFC), as well as the parties' RCFC 52.1(c) cross-motions for judgment on the administrative record (AR). Innovation Development Enterprises of America, Inc. (IDEA) asserts that the United States Air Force violated the Competition in Contracting Act of 1984 (CICA), Pub. L. No. 98-369, tit. VII, §§ 2701-2753, 98 Stat. 1175 (codified at scattered sections of the United States Code), when it issued Contract No. FA7014-10-P-A010, a sole-source contract (the bridge contract), to Harris IT Services Corporation (Harris) on May 18, 2010.[2] Compl. ¶ 77; AR at 71. The bridge contract provided support services to the Air Force's Command Man-Day Allocation System (CMAS), a system which is "used to place Air National Guard and Air Force Reserve Members on temporary tours of active duty." AR at 20. The contract services included "software support, assessment support, database administration, and configuration management." *Id.* at 85. The court agrees with plaintiff that the sole-source procurement at issue in this case was significantly flawed and that plaintiff was prejudiced by the sole-source award to Harris; for these reasons, plaintiff's motion for judgment on the administrative record must be granted in part.

## BACKGROUND[3]

## I.     The Air Force Awards a Sole-Source Contract to Harris

---

[2]/ As discussed in more detail *infra*, a sole-source bridge contract typically "bridges" the gap from one competitive procurement to the next. *See, e.g.*, *Infrastructure Def. Techs., LLC v. United States*, 81 Fed. Cl. 375, 401 (2008) ("A bridge contract is used to cover immediate minimum agency needs while a bid protest or other action is pending, or to cover a transition period between competitive procurements.") (citations omitted). Here, the record shows that the sole-source contract awarded to Harris was intended to bridge the gap between two five-year contracts. AR at 177 ("Subject contract was awarded as a bridge to allow the [Air Force] contracting activity to put in place a competitive follow-on 5 year contract, basic and four (4) one year options.").

[3]/ The court relies primarily on the administrative record in this case. However, gaps in the history of this procurement require the court to also rely on the complaint and other materials submitted by the parties. All references and citations in this opinion to the complaint are to the amended complaint filed February 21, 2012.

According to plaintiff, CMAS was designed and programmed in the mid-1990's, at least in part, by Mr. Lawrence A. Crain, who was then an Air Force reservist.[4] Compl. ¶¶ 8, 17, 27. He continued to provide support to CMAS through late 1998, when he retired from the Air Force Reserve. *Id.* ¶ 27. Mr. Crain then returned to support CMAS as a subcontractor to Harris in mid-1999, in his new capacity as the sole proprietor of IDEA. *Id.* ¶ 17. For an additional eight years, Mr. Crain functioned as "technical lead" for CMAS, until Harris in November 2007 ended IDEA's subcontract on the CMAS project. *Id.* ¶¶ 17, 28.

The procurement history for the CMAS project is somewhat obscure. According to plaintiff, the initial CMAS contract was awarded to Harris in 1999. Compl. ¶ 28. The administrative record of this protest contains only one predecessor contract to the sole-source contract challenged by plaintiff – this "old" contract, which ordered services against Harris's "GS" Schedule, is dated October 1, 2004, for a period of performance, including option years, from October 1, 2004 through September 30, 2009. AR Tab 1; Def.'s Mot. at 2. A six-month extension of services was permitted by the contract.[5] AR at 17 (citing FAR 52.217-8, 48 C.F.R. § 52.217-8 (2012)).[6] Thus, in October 2004, the Air Force was on notice that by no later than March 31, 2010 it should have completed a procurement for CMAS services to follow the "old" contract, if CMAS contract services were indeed required on an ongoing basis.

There is no document in the administrative record which shows that the Air Force made any arrangement to complete a procurement for CMAS before March

---

[4] All references to "Mr. Crain" in this opinion are to Mr. Lawrence A. Crain, not to his brother Mr. Charles H. Crain, who now represents IDEA in this bid protest that was originally brought *pro se*.

[5] No contract amendment authorizing an extension of the old contract through March 31, 2010 is in the record before the court. The only evidence that the extension occurred is a December 11, 2009 email from Mr. Crain to the Air Force, stating that "I have . . . learned that the . . . CMAS contract was extended by six months." AR at 206.

[6] All other citations to Federal Acquisition Regulation (FAR) provisions in this opinion are to the 2009 version of Title 48 of the United States Code of Federal Regulations, which was in effect at times relevant to this sole-source procurement. The court notes that the current version of the FAR does not appear to differ from the 2009 version in provisions relevant to this procurement.

3

31, 2010. If there was any procurement planning regarding a follow-on contract, it is not in the record before the court. In addition, the existence of any contracting vehicle established for the period of April 1, 2010 through April 18, 2010, a period of time not, apparently, covered by the "old" contract and not covered by the sole-source contract, is also not reflected in the record. The record appears to indicate that Harris continued to perform during these two and a half weeks, because Harris is consistently described as the incumbent contractor that received the sole-source bridge contract that became effective on April 19, 2010. *See, e.g.*, AR at 92, 96; Def.'s Mot. at 2.

The record before the court contains no evidence that the Air Force made any efforts to ensure competition for the CMAS contract between October 1, 2004 and April 15, 2010. The court observes that Mr. Crain repeatedly contacted the Air Force in 2009 to inquire as to the "upcoming" competitive procurement for CMAS services, and to propose IDEA as a responsible source for such services. *See, e.g.*, AR at 194 (February 9, 2009 email titled "Upcoming CMAS procurement"); *id.* at 198 (March 24, 2009 email titled "RE: Upcoming CMAS procurement"); *id.* at 204 (April 17, 2009 email titled "Upcoming CMAS procurement"); *id.* at 206 (December 11, 2009 email titled "Upcoming CMAS procurement"). These messages did not achieve their aim of allowing IDEA to submit a bid for a contract to provide CMAS services to the Air Force – the only substantive response received from the Air Force was that Mr. Crain should watch for procurement announcements on the FedBizOpps website. *Id.* at 198.

Approximately two weeks after the five and a half years available to the Air Force for procurement planning had elapsed, on April 15, 2010, the Air Force produced what appears to be a draft solicitation for a bridge contract for CMAS services to be provided from approximately April 19, 2010 to June 20, 2011. AR Tab 2; *see also* AR Index at 1 (describing the document as "Solicitation FA7014-10-R-A010 and the CMAS Statement of Work"). This sixteen-page document, which follows the format of the old contract, was never posted on the FedBizOpps website, however. Also on April 15, 2010, an email, which is not in the record before the court, was sent from the Air Force to Harris, and this email apparently contained a request for proposal (RFP) for a sole-source contract to be awarded to Harris. AR at 51. The next day, April 16, 2010, a Friday, the Air Force sent a Notice to Proceed to the incumbent contractor Harris for CMAS services to begin Monday, April 19, 2010. AR Tab 3. The Notice to Proceed stated that Harris "is authorized to begin work as of 19 April 2010 and the resulting contract will identify

4

that as the effective date." *Id.* That Notice to Proceed also stated the "Government's intent to award a contract to Harris . . . for support of [CMAS] and . . . authoriz[ation of] service support [for CMAS] effective 19 April 2010 - 18 April 2011, total not to exceed $500k." *Id.*

Not surprisingly, Harris responded to the agency's RFP with a price proposal for nearly $500,000 – $497,047. AR at 69. In a document dated May 12, 2010, the Air Force contract specialist found Harris's $497,047 price proposal to "represent[] the best value to the government." *Id.* at 69. The document notes that "only one quote was received," which is unsurprising in light of the fact that no notice had been given to the contracting community of an upcoming CMAS procurement. *Id.* at 68.

Using less than persuasive logic, the Air Force found the increase in labor rates, from the old contract to the sole-source contract, to be reasonable: "As there is no . . . market research information [other than information from the old contract] to compare [labor rate increases; Harris's] 2.74% increase is considered reasonable." AR at 69. Aside from the increase in labor rates, the court observes that additional costs had been added to the contract, which had either been much lower in the old contract, or not previously required. For example, under the old contract, over the course of five years, approximately $4000 or $5000 was allocated for the contractor's travel costs. *See* AR at 4, 10-11, 13. Under the sole-source contract, $8,888 was awarded to Harris for just one year of travel. *Id.* at 69. There is no analysis of this enormous price increase for travel. Instead, the contract specialist concluded that pursuant to "FAR 13.106(a)(2) the price of this [overall contract] requirement is considered fair and reasonable." *Id.*

Furthermore, a new cost category was instituted, "IA/C&A," which would cost the Air Force $74,789 for the one-year sole-source contract.[7] *Id.* at 69, 74. The contract specialist does not report any attempts to determine whether this new contract cost was reasonable. Thus, the Air Force's price reasonableness inquiry, such as it was, turned a blind eye to one radical price increase and made no effort to assess the reasonableness of a new category of costs in Harris's proposal.

---

[7]/ The acronym "IA/C&A" signifies "information assurance/certification and accreditation." *See* Air Force Policy Directive 33-2, at 1-2 (Aug. 3, 2011), at http://www.e-publishing.af.mil (last visited Jan. 9, 2013).

Although the Notice to Proceed appeared to cap costs for the CMAS sole-source contract at $500,000, *see* AR at 50, this cap soon proved to be illusory. In September 2010, the sole-source contract was amended to add two staff positions, a software engineer and a senior software engineer. *Id.* at 109. This new labor cost added $124,047 to the sole-source bridge contract. *Id.* at 110. This contract amendment increased the contract price from $497,047 to $621,094, an increase of approximately 25%. *Id.* In April 2011, the Air Force amended the sole-source contract to extend Harris's performance for another six months, which added an additional $350,405.50 to the contract price, of which $106,326 was related to the staff persons added in September 2010. *Id.* at 185. The six-month extension increased the total cost of the contract to $971,499.50. *Id.* The two contract amendments, together, represent a 95% increase in the total price of the sole-source contract.

Two significant irregularities in the award of the sole-source contract to Harris are conceded by the Air Force in memoranda that are included in the administrative record before this court.[8] The first is the Air Force's admission that a violation of FAR 5.207(c)(15) occurred when the Air Force failed to post a synopsis of the proposed award of the sole-source contract to Harris on the FedBizOpps website. AR at 68 ("Although a synopsis could have been posted for several days prior to award this was not accomplished due to [an] oversi[ght] by the contracting specialist."). According to this memorandum dated May 12, 2010, the Notice to Proceed was issued on April 19, 2010, before the contract requirement was sent to the contract specialist.[9] *Id.* Thus, when the contract specialist was provided the necessary information on May 5, 2010, she could have but did not post a synopsis

---

[8]/ The contracting officer certified that the documents included in the administrative record "constitute the record of the administrative actions performed in the above-referenced solicitation and Contract and relevant to the issues raised in the plaintiff's complaint." AR Certification. The contracting officer also states that the administrative record contains documents of the type identified in RCFC Appendix C. *Id.* The court notes the absence of correspondence between the Air Force and Harris, referenced in Harris's price proposal for the sole-source contract. *See* AR at 51; *cf.* RCFC App. C ¶ 22(i). The court also notes that there are no contract documents relating to the six-month extension of the old contract, or describing contract performance, if any, that occurred between April 1, 2010 and April 18, 2010. Although these documents are not specifically required by RCFC Appendix C, their absence impedes the court's analysis of the agency's decision to award a sole-source contract to Harris.

[9]/ The Notice to Proceed is dated April 16, 2010, not April 19, 2010.

6

of the proposed sole-source award before the contract was signed on May 18, 2010. *Id.* The court agrees that FAR 5.207(c)(15)(ii) was violated by the Air Force in this procurement, as discussed *infra*.

The second conceded violation of procurement regulations occurred when the Air Force failed to conduct market research before awarding the sole-source contract to Harris. The contract specialist explained in a memorandum dated May 12, 2010 that FAR Part 10 requires a market research report in the contract file and that no such report was compiled in this instance. AR at 70. The Air Force acknowledged that no market research had been done in its Justification and Approval (J&A) for the sole-source award to Harris. *Id.* at 97. The court agrees that the Air Force violated FAR Part 10 by not conducting market research before issuing the sole-source contract to Harris, as discussed in more detail *infra*.

On May 18, 2010, the Air Force and Harris signed the one-year sole-source bridge contract for CMAS support services, with a contract award date of May 18, 2010 and an effective date of April 19, 2010. AR at 71, 101. On May 21, 2010, the Air Force posted an award notice on FedBizOpps concerning the sole-source contract. *Id.* at 106-08. Also on May 21, 2010, the Air Force posted the J&A on FedBizOpps, *id.* at 100-02, a document which appears to rely primarily on the Air Force's determination that there was only one responsible source for CMAS support services, and secondarily on the unusual and compelling urgency of the procurement, *compare id.* at 96 *with id.* at 100-01. The sole-source contract, including its six-month extension, has now been fully performed by Harris. *See* AR at 182.

## II.    IDEA Protests the Sole-Source Award to Harris

IDEA promptly responded to the award notice on FedBizOpps, although its response was not crafted by an attorney. First, Mr. Crain sent an email to the Air Force on May 25, 2010, complaining about the sole-source award to Harris, arguing that IDEA was a responsible source for CMAS support services, and pointing out several aspects of the J&A that appeared to him to be counter-factual. AR at 210-12. The next day, Mr. Crain sent another email correcting one assertion in his previous email, but continuing to emphatically complain about the sole-source award to Harris. *See* AR at 213 (stating that "I object to the decision to sole-source CMAS to the incumbent"). On May 26, 2010, in response to these emails, the contract specialist responsible for the CMAS procurement stated that "[w]e have

7

received your email and are looking into the situation. We will let you know when we have more information." AR at 214.

Mr. Crain, on May 26, 2010, expressed his desire to not "interrupt" the essential function of CMAS, but nonetheless "gently" asserted that the sole-source contract award to Harris was "erroneous." AR at 214-15. Mr. Crain's gentle approach, however, did not succeed in eliciting any further communication from the Air Force. Twenty days later, on June 15, 2010, Mr. Crain again emailed the Air Force, asking for news of any information obtained by the agency's inquiry into the sole-source award, and for an estimate as to when his concerns might be resolved. *Id.* at 216. This email, too, received no response.

On July 1, 2010, Mr. Crain telephoned the contact person he had been referred to in the May 26, 2010 email from the Air Force, only to be told that this person was not the right person to contact. AR at 218. Mr. Crain emailed this person the same day, asking that he be notified once the correct point of contact had been identified by the Air Force. *Id.* In response to this email, Mr. Crain was told on July 1, 2010 that his correspondent "will advise regarding the correct [point of contact] as soon as I can identify him." *Id.* at 220.

After more than a week went by with no further communication from the Air Force, on July 9, 2010, Mr. Crain emailed a "Sole Source Protest Letter" to the Air Force, which noted the grounds for the protest, the relief requested, and the unresponsiveness of the agency to his prior efforts to complain about the sole-source award. AR at 103-05. On July 14, 2010, an Acting Branch Chief of the Air Force, through an email sent to Mr. Crain, acknowledged his July 12, 2010 receipt of IDEA's protest. *Id.* at 223. This email promised Mr. Crain that the Air Force would "investigate your allegations and provide you a response." *Id.*

Mr. Crain received no further response to his "Protest Letter." On July 29, 2010, Mr. Crain emailed the Air Force asking for an update. AR at 227. No response came. On August 13, 2010, Mr. Crain again asked for an update, and expressed some impatience with the lack of response to his protest. *Id.* at 228. No response was received. On September 10, 2010, Mr. Crain again emailed the Air Force (and tried, without success, to reach the Acting Branch Chief by telephone), requesting an estimate as to when he could obtain a ruling on his protest and, at a minimum, the courtesy of an acknowledgment of his latest email. *Id.* at 230-32. Again, Mr. Crain's communications elicited no response from the agency.

8

IDEA then filed a *pro se* protest of the Air Force's sole-source contract award to Harris with the Government Accountability Office (GAO) on September 21, 2010. AR at 118, 150. The protest grounds included an allegation that the sole-source award was improper, and that the Air Force had improperly ignored IDEA's agency-level protest. *Id.* at 118. The GAO dismissed IDEA's protest, and IDEA's motion for reconsideration, ruling, first, that IDEA's earliest emails to the Air Force, in May 2010, did not constitute an agency-level protest. AR at 151, 166-67. Instead, the GAO found that the July 9, 2010 "Sole Source Protest Letter" initiated IDEA's agency-level protest; that agency-level protest, filed forty-nine days after the May 21, 2010 award notice, was deemed by GAO to be untimely. *Id.* Absent a timely agency-level protest, IDEA's GAO protest filed September 21, 2010 was also found to be untimely, and was dismissed for this reason. *Id.* Neither the Air Force nor the GAO ever reached the merits of IDEA's protests of the sole-source award to Harris.

On April 7, 2011, Mr. Crain filed a *pro se* bid protest in this court, with both Mr. Crain and IDEA named as plaintiffs. The court ordered IDEA to obtain counsel, granted defendant's motion to dismiss Mr. Crain as an individual plaintiff, and permitted the remaining plaintiff, IDEA, to file an amended complaint. *See* Order of January 11, 2012. The principal questions in this suit, at this point, are whether the court may reach the merits of IDEA's protest of the sole-source contract award to Harris, and, if so, whether the agency's sole-source award was improper.[10] Although defendant presents numerous arguments in support of the government's position on these two questions, plaintiff's arguments prevail.

## DISCUSSION

### I. Jurisdiction

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a

---

[10]/ IDEA's protest contains multiple allegations of agency error. This opinion largely concerns plaintiff's allegation that the sole-source award to Harris was improper (Count I of the complaint), which is dispositive of plaintiff's claims, and reserves a brief discussion of the other grounds presented in the complaint for one of the final sections of this opinion.

proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* Although plaintiff also relies upon 28 U.S.C. § 1491(a) (2006), *see* Compl. ¶ 15, there is some debate whether procurements subject to bid protests under § 1491(b) are also subject to bid protest jurisdiction under § 1491(a). *See, e.g.*, *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1246 (Fed. Cir. 2010) ("We agree that Congress intended the 1491(b)(1) jurisdiction to be exclusive where 1491(b)(1) provided a remedy (in procurement cases)."). Because plaintiff's suit rests on the firm jurisdictional footing of § 1491(b)(1), the court need not inquire whether the court could also consider plaintiff's claims under § 1491(a).

## II. Standards of Review

### A. Motion to Dismiss for Lack of Jurisdiction

In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1),[11] this court must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). However, plaintiff bears the burden of establishing subject matter jurisdiction, *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)), and must do so by a preponderance of the evidence, *Reynolds*, 846 F.2d at 748 (citations omitted). If

---

[11]/ The government's motion to dismiss under RCFC 12(b) is almost entirely based on jurisdictional arguments. Defendant does, however, invoke RCFC 12(b)(6) twice in its moving brief. Its first RCFC 12(b)(6) argument relates to Count IV of the complaint, Def.'s Mot. at 10, and will be discussed *infra*. The second RCFC 12(b)(6) challenge to the complaint is contained in a footnote, Def.'s Mot. at 20 n.8, and is supported by no legal authority. Defendant argues that plaintiff has not substantiated its bid preparation and proposal costs, and thus plaintiff's bid protest complaint should be dismissed for failure to state a claim. *Id.* A bid protest does not fail to state a claim, however, merely because the protestor has not supplied, in the complaint, the supporting documentation required to justify a specific amount of bid preparation costs. *See, e.g.*, *Impresa Construzioni Geom. Domenico Garufi v. United States*, 61 Fed. Cl. 175, 177 (2004) (ruling that the protestor was entitled to bid preparation and proposal costs, as a general matter, and then ruling on the evidence subsequently presented by the protestor to determine whether any specific amount of bid preparation and proposal costs was due the plaintiff).

10

jurisdiction is found to be lacking, this court must dismiss the action. RCFC 12(h)(3).

## B.    Judgment on the Administrative Record

RCFC 52.1(c) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

## C.    Bid Protest Review

As a threshold jurisdictional matter, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*). Standing arises from prejudice, which is proven by establishing that the plaintiff had a substantial chance of receiving the contract, but for the alleged procurement error. *Id.* (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). A protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement, and has standing before this court. *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307-08 (Fed. Cir. 2006) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002)).

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (*Impresa*) (citations omitted). *De minimis* errors in the procurement process, however, do not justify

11

relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when . . . awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted). If a protestor can show that, but for the procurement error of the agency, there was a substantial chance that it would have won the contract award, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## D. Sole-Source Procurements

The sole-source procurement in this case is governed by 10 U.S.C. § 2304 (2006), a provision of CICA which states in relevant part:

> The head of an agency may use procedures other than competitive procedures only when –
> (1) the property or services needed by the agency are available from only one responsible source or only from a limited number of responsible sources and no other type of property or services will satisfy the needs of the agency;
> (2) the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is

permitted to limit the number of sources from which it
solicits bids or proposals . . . .

10 U.S.C. § 2304(c).  The agency may not justify a sole-source award by reason of its own "lack of advance planning."  10 U.S.C.A. § 2304(f)(4)(A) (West 2010) (formerly codified at 10 U.S.C. § 2304(f)(5)(A)).  CICA also requires that "[t]he head of an agency using procedures other than competitive procedures to procure property or services by reason of the application of subsection (c)(2) or (c)(6) shall request offers from as many potential sources as is practicable under the circumstances."  10 U.S.C. § 2304(e).

The Federal Acquisition Regulation (FAR) has incorporated these principles in FAR 6.302-1, FAR 6.302-2, and related sections.  An agency conducting a sole-source procurement must support that action by "written justifications and approvals."  FAR 6.302-1(d)(1); FAR 6.302-2(c)(1).  Sole-source procurements are generally subject to a variety of restrictions designed to foster competition, such as requirements that agencies conduct market research and give notice to potentially responsible contractors.  *See* FAR 5.207(c)(15); FAR Pt. 10.

As in other bid protests, a sole-source procurement decision may be set aside if:  "(1) the sole-source award lacked a rational basis; or (2) the sole-source procurement procedure involved a violation of a statute, regulation, or procedure."  *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001) (citing *Impresa*, 238 F.3d at 1332).  Under the first ground, "[t]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Id.* (citations omitted).  Under the second ground, the court examines the sole-source procurement for violations of law or regulation, in the absence of which the protestor would have had a substantial chance of receiving an award under either a competitive bidding process (where the sole-source procedure was made irrational by the violations), or under the sole-source procedure.  *Id.* (citations omitted).

## III.   Standing

Defendant relies on *Myers*, 275 F.3d at 1370-71, for the proposition that IDEA must establish that it would have been a qualified bidder for CMAS support services in a competitive procurement.  Def.'s Mot. at 6.  This is the correct standard for standing, but the administrative record does not support the

government's contention that IDEA would not have been a qualified bidder in this instance. Indeed, the *only* information in the administrative record that addresses whether or not IDEA would have been a qualified bidder for CMAS support services shows that IDEA had substantial CMAS experience and could have performed a twelve-month bridge contract, or, if the Air Force needed a six-month extension, an eighteen-month bridge contract. *See* AR Tab 22.

The government suggests, and the record indicates, that Harris supported CMAS with three full-time workers in 2009 and in early 2010. Def.'s Mot. at 7; AR at 32, 46, 50, 90. Defendant argues that IDEA was too small to field three workers for CMAS support services. Def.'s Mot. at 8. IDEA proposed, however, to staff CMAS with one IDEA employee (Mr. Crain), and two subcontractors, just as Harris had provided one Harris employee, and two subcontractors. *See* AR at 195-96, 214; Pl.'s Resp. at 9. This case is thus unlike *Myers*, where the protestor "presented no evidence that it was qualified to secure the award[] if [it] had been made the subject of competitive bids." 275 F.3d at 1371. The court finds that IDEA was a qualified bidder for a competitive procurement for a bridge contract for CMAS support services in 2010.[12]

The government also argues that IDEA has not shown that it had a substantial chance of winning a contract for CMAS support services, and has thus not shown prejudice to establish its standing to bring this suit. Def.'s Mot. at 8. It is true that the protestor of a sole-source procurement must show that it had a substantial chance of contract award but for the agency's decision to limit competition for the contract. *See, e.g.*, *ITAC*, 316 F.3d at 1319 (discussing the substantial chance standard for prejudice and standing); *Emery Worldwide*, 264 F.3d at 1086 (noting that the same standard applies in sole-source bid protests). But this standard requires only that a protestor's chance of award "must not have been insubstantial." *ITAC*, 316 F.3d at 1319 (citations omitted). Here, IDEA clearly meets this standard, because its experience with CMAS gave IDEA a substantial chance of contract

---

[12]/ Defendant appears to argue that the fact that IDEA had not yet won a contract with the United States prevented IDEA from being a qualified bidder. Def.'s Mot. at 7-8. Nothing in *Myers* suggests that first-time bidders on federal contracts lack standing, as a general rule, to protest sole-source awards.

award in a competitive procurement for the bridge contract awarded to Harris.[13] *See* AR Tab 22; Pl.'s Resp. at 7-10.

In its reply brief, the government suggests that IDEA's standing depends solely on the information before the agency at the time it made its decision to award a sole-source contract to Harris. Def.'s Reply at 5. This position is incorrect. If, in a competitive procurement, IDEA had bid on the bridge contract, the agency's evaluation of that bid would stand or fall based on the record before the agency at that time. Here, however, IDEA's status as a qualified bidder that had a substantial chance of contract award in a hypothetical competitive procurement may be established by material before the agency at the time of the sole-source award *and* material provided by IDEA during the course of this bid protest. *See, e.g.*, *Myers*, 275 F.3d at 1371 (affirming this court's ruling on standing, which was based on evidence, or the lack of evidence, provided by the protestor during the course of the litigation). For all of the above-cited reasons, IDEA has standing to bring this suit.


## IV. Mootness

Defendant argues that this protest is moot and must be dismissed because the bridge contract has been fully performed, and "no effectual relief is available." Def.'s Mot. at 5. This legal position, too, is incorrect. Although plaintiff's requests for injunctive relief and declaratory judgments are either abandoned or moot, IDEA's request for bid preparation costs is very much a live controversy. Defendant's argument to the contrary has no merit.

Defendant relies on *Glenn Def. Marine (Asia), PTE v. United States*, 469 F. App'x 865 (Fed. Cir. 2012), as support for the government's argument that this bid protest should be dismissed on mootness grounds. Def.'s Mot. at 5; Def.'s Reply at 3. The court notes that *Glenn* is a non-precedential opinion and does not bind this court. More importantly, *Glenn* is inapposite. In *Glenn*, the protestor's appeal was moot because the agency took corrective action which gave the protestor exactly what it sought to achieve through the court's intervention in the procurement process. *See* 469 F. App'x at 867 ("Glenn Defense seeks to enjoin a contract for

---

[13] / The administrative record contains no review by the Air Force of IDEA's qualifications as a bidder or of its chance of receiving an award for CMAS support services.

performance of services that it has now been awarded. Thus, . . . there is no actual, ongoing case or controversy for us to decide."). Here, IDEA was not awarded the bridge contract, and its suit has not been addressed by any corrective action so as to render IDEA's bid protest moot. Thus, *Glenn* does not support defendant's mootness argument.

The Federal Circuit has stated that a request for bid preparation and proposal costs presents a live controversy even when the underlying protest concerned an awarded contract which, during the course of the protest, has been fully performed. *Pacificorp Capital, Inc. v. United States*, 852 F.2d 549, 550 (Fed. Cir. 1988). This precedent is binding on the court. IDEA's request for bid preparation costs prevents this protest from being dismissed as moot.[14] The court now turns to the merits of plaintiff's protest, and begins with a review of the document which presents the Air Force's rationale for the sole-source award to Harris.

## V. The Sole-Source Justification and Approval

By March 9, 2010, Mr. Michael J. Fedorzak, the Air Force's CMAS manager, had signed the Justification and Approval (J&A) for a sole-source award to Harris. AR at 99. More than a month passed, however, before other approval signatures were obtained for the J&A on April 16, 2010, the day the Notice to Proceed was provided to Harris. *Id.* at 50, 99. Contract award was then delayed another month, until May 18, 2010, although Harris had already been performing the sole-source contract during this period. *Id.* at 101. The J&A was posted on FedBizOpps on May 21, 2010. *Id.* at 100-01. The delays in obtaining approvals for the J&A, and in posting the J&A, are unexplained.[15]

The first pages of the J&A are devoted to a description of the CMAS services to be obtained from Harris. AR at 92-96. The document then turns to a justification

---

[14]/ IDEA's request for attorney fees will be discussed *infra*.

[15]/ The CMAS contract was apparently transferred from one contracting office to another within the Air Force sometime in 2009 or 2010. *See* AR at 195, 206, 208; Compl. ¶ 32. It is possible that this transfer led to inefficiencies in the contracting function. *See* AR Tabs 5-7.

16

of the sole-source award. The principal cited authority[16] for the sole-source procurement is the "only one responsible source" authority found in 10 U.S.C. § 2304(c)(1) and FAR 6.302-1(a)(2)(iii). AR at 96. The relevant FAR provision states that

> services may be deemed to be available only from the original source in the case of follow-on contracts for the continued provision of highly specialized services when it is likely that award to any other source would result in (A) substantial duplication of cost to the Government that is not expected to be recovered through competition, or (B) unacceptable delays in fulfilling the agency's requirements.

FAR 6.302-1(a)(2)(iii). Additional cited authority for the sole-source procurement to Harris is the "unusual and compelling urgency" authority of FAR 6.302-2(a)(2). AR at 96. This FAR provision states:

> When the agency's need for the supplies or services is of such an unusual and compelling urgency that the Government would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals, full and open competition need not be provided for.

FAR 6.302-2(a)(2).

The J&A then presents the rationale for a sole-source award for CMAS services. The Air Force notes the need to avoid "substantial disruption" of CMAS services. AR at 96. The document asserts that hiring a new CMAS contractor would "involve a substantial duplication of costs," require "approximately six to ten months to achieve Harris's current level of productivity," and "cost . . . more than

---

[16] / The only authority noted on the summary page on FedBizOpps was "FAR 6.302-1 – Only one responsible source." AR at 101. The narrative of the J&A also focuses primarily on Harris's qualifications and "the use of only one responsible source authority," which is provided, in appropriate circumstances, by FAR 6.302-1. AR at 98. It is possible that the inclusion of FAR 6.302-2 in the J&A is a mere scrivener's error.

$1,500,000 given current labor rates." *Id.* The J&A also states that CMAS functions "will be severely jeopardized if a new vendor takes over at this point." *Id.*

Under the rubric "Efforts to Obtain Competition," the Air Force noted that "no [existing contract] vehicle was found" that could support CMAS. AR at 96. As for market research, the J&A states that "[m]arket research was not conducted due to the short time line and the fact that no barriers exist because the services rendered are highly specialized and unique to the incumbent contractor." *Id.* at 97. It is unclear what the term "barriers" is meant to signify in that sentence. Perhaps the author of the J&A believed that there were no barriers to using a sole-source competition because Harris was, in the author's view, the only responsible source for CMAS services.

In a lengthy narrative section, the J&A next praises Harris's experience and expertise. The document states that "[t]here are currently no other contractors with both the technical and professional skills necessary" to support CMAS. AR at 97. The J&A warns of a "substantial disruption" if a new contractor were to support CMAS. *Id.* After describing a number of important CMAS projects, the J&A asserts that a transition to a new contractor would pose numerous risks, including a reduction in "system progression," a "huge delay in program completion," "duplication in costs," "serious and adverse mission consequences," "possible stoppage of system applications," and "serious detrimental impact to the Air Force's ability to confidently implement . . . policy changes." *Id.* at 98.

The J&A states that it is "doubtful" that any other contractor could "develop expertise comparable to that of Harris." AR at 98. Under the rubric "Interested Sources," the J&A reports "NONE." *Id.* The document also notes that Harris possessed a General Services Administration Federal Supply Schedule, against which a delivery order for the bridge contract could be written.[17] *Id.* The J&A therefore concludes that "a demonstration is presented that the current contractor's unique qualifications and the nature of this acquisition require[] the use of only one responsible source authority and that is Harris." *Id.* The J&A contains no discussion, however, of the advance planning, or lack thereof, for a procurement

---

[17]/ There is no evidence in the administrative record that the bridge contract was indeed placed against a GSA Supply Schedule. *Compare* AR at 1 *with id.* at 71.

that would have permitted full and open competition for the award of a CMAS contract in April 2010.

## VI.    Whether the Air Force's Sole-Source Award to Harris was Justified

Plaintiff asserts that the sole-source award to Harris was improper, arbitrary and capricious, and contrary to law.  Compl. ¶¶ 5, 76-77.  One specific violation of regulation noted by plaintiff is the failure to publish a timely notice of the proposed sole-source award to Harris.  *Id.* ¶ 35.  The more general violation of law alleged by plaintiff is that the Air Force ignored its responsibility to foster fair and open competition for government contracts.  *Id.* ¶ 70.  In support of this contention, plaintiff asserts that the Air Force improperly ignored IDEA's repeatedly expressed interest in competing for the CMAS contract requirement.  Pl.'s Mot. ¶ 5.

Plaintiff notes that the contract file contains concessions by the contract specialist that violations of procurement regulations occurred.  Pl.'s Mot. ¶ 8.  Defendant concedes that errors were made in the sole-source award to Harris, but dismisses them as "technical" or "minor" errors.  Def.'s Mot. at 14, 19.  Plaintiff argues, however, that by excluding IDEA from any competition for the CMAS bridge contract, and by only soliciting a bid from Harris, the Air Force's sole-source award was not in accordance with law.  Pl.'s Resp. at 14.  Plaintiff also notes, correctly, that there is no review of IDEA's qualifications or responsibility in the administrative record; thus, the agency's failure to solicit a bid from IDEA is entirely unexplained in the J&A or in any other contemporaneous documents that were before the agency at the time it made its sole-source award.  *Id.* at 8.  Finally, plaintiff asserts that the Air Force violated procurement law when it failed to conduct a proper search for responsible sources to perform the CMAS contract requirement.  *Id.* at 12.

Although plaintiff's protest is less than robust in citations to specific FAR provisions or caselaw, the court agrees that this procurement was fundamentally flawed.  The sole-source award to Harris was arbitrary and capricious, and included numerous violations of procurement regulations which were significant.  The court notes that sole-source procurements were specifically addressed by CICA and that agencies must operate within the restrictions placed upon them by Congress:

> Congress establishes the rules for federal procurement and
> federal agencies have only the discretion that Congress

> allows them. In the CICA, Congress expressed concern
> that federal agencies had misused the authority Congress
> had granted them and too often resorted to sole source
> contracts. To control this practice, Congress mandated
> that unless a statutory exception applies,
> federal agencies must purchase products and services
> based upon "full and open competition through the use of
> competitive procedures."

*ATA Def. Indus., Inc. v. United States*, 38 Fed. Cl. 489, 504 (1997) (*ATA Defense*) (quoting 10 U.S.C. § 2304(a)(1)(A)). The court turns first to the issue of advance planning by the Air Force for a CMAS procurement.

### A.    Lack of Advance Planning

CICA provides that sole-source procurements may not be used when the circumstances justifying the award were due to the agency's own lack of advance planning. 10 U.S.C.A. § 2304(f)(4)(A); FAR 6.301(c)(1); *WorldWide Language Res., Inc.*, B-296993, 2005 CPD ¶ 206, 2005 WL 3143870, at *9 (Comp. Gen. Nov. 14, 2005). To the extent that the Air Force justifies its sole-source award to Harris on "the short time line" available to properly research responsible sources for the CMAS contract, AR at 97, this justification violates CICA. The time-frame for the award of this bridge contract was, on the record before the court, entirely the result of a lack of advance planning on the part of the Air Force.

As the court noted earlier in this opinion, the Air Force could not have been unaware of the expiring five-year contract with Harris well in advance of 2009 and 2010. Further, given the generous time-frame available for procurement planning here, there have been no representations made by the government that any impediments precluded advance planning. There is no evidence in the record of any efforts by the Air Force to conduct adequate market research, or to plan and prepare for a competitive procurement, before Harris's old contract expired on March 31, 2010.[18] Mr. Crain also persistently reminded Air Force personnel of their

---

[18]/ The court notes that this is not a bid protest where the administrative record was hastily filed pursuant to an expedited litigation schedule. The administrative record was filed over a year after the suit was filed, and almost three months after the amended complaint was

continue...

obligation to foster full and open competition for the CMAS program, beginning in February 2009. This court's rules indicate that procurement planning documents should be included in the administrative record, *see, e.g.*, RCFC App. C ¶ 22(b), but here there are none which evidence an attempt to conduct a timely, competitive procurement.[19] The court concludes that the sole-source contract awarded to Harris violates 10 U.S.C.A. § 2304(f)(4)(A), because of the lack of advance planning on the part of the Air Force.

Much of the sole-source justification provided by the Air Force relies on the unacceptably long transition time that would have been required before a new contractor could provide CMAS support services. *See* AR at 96 (estimating that approximately six to ten months would be necessary for a transition to a new contractor), 98 (noting the "lengthy learning curve" that a new CMAS contractor would face ), 98 (estimating that "upwards of ten months" would be necessary for a transition to a new contractor). Based on the record before the court, this problem, too, cannot be attributed to anything but the Air Force's lack of advance planning. Failure to account for transition periods between an incumbent contractor and a new contractor is yet another form of lack of advance planning. *See, e.g.*, *Techno-Sciences, Inc.*, B-257686, 94-2 CPD ¶ 164, 1994 WL 606131, at *5 (Comp. Gen. Oct. 31, 1994) (citation omitted).

For all of these reasons, the court finds that the sole-source award violates CICA because it is based on the agency's lack of advance planning.[20]

---

[18]/ ...continue
filed. The Air Force had ample time to assemble a complete administrative record to support its sole-source award to Harris.

[19]/ Indeed, the only planning documents in the record show that the Air Force took steps to prepare for a sole-source award, not a competitive award. *See* AR at 99 (showing that the J&A for the sole-source award was prepared by March 9, 2010); 34 (showing that a draft bridge contract solicitation was prepared by April 15, 2010); 51 (showing that the Air Force contacted Harris on April 15, 2010 to solicit a bid for the sole-source award); 50 (showing that Harris was given a Notice to Proceed on April 16, 2010 in advance of the issuance of the sole-source contract).

[20]/ Although plaintiff did not raise this issue as a separate bid protest ground, Mr. Crain noted the J&A's improper reliance on a "'short timeline'" in his first email to the Air Force complaining about the sole-source award. AR at 211.

### B.    Arbitrary and Capricious Reasoning

According to the J&A, the agency determined that Harris was the only responsible source for CMAS support services.  AR at 96.  However, the same document concedes that no market research was performed.  *Id.* at 97.  Thus, the agency's determination that Harris was the only contractor that could provide CMAS support services appears to be founded on:  (1) the fact that the Air Force examined other existing contract vehicles to see if CMAS could be incorporated into those existing contracts; and (2) the fact that CMAS support services are "highly specialized and unique to" Harris.  *Id.* at 96-97.  There is no indication, however, that the Air Force engaged in a meaningful consideration of the capabilities of other potential sources, before drafting the J&A, to support its conclusion that CMAS support services *are* unique.[21]  Thus, the Air Force's determination that Harris was the one responsible source for CMAS support services was unreasonable.  *See, e.g.*, *WorldWide Language*, 2005 WL 3143870, at *12 (finding "a critical error" in a sole-source award where "firms other than [the incumbent] and their capabilities were simply not meaningfully considered").

The court also questions, as did Mr. Crain in his first post-J&A email to the Air Force, AR at 211, the factual presumptions supporting the sole-source award to Harris.  The J&A states that "the Government is confident that the proposed number of hours, labor rates, and labor categories will be comparable and reasonable [as they have been in the past]," apparently because Harris would keep the same personnel and Harris's prices for the old contract had been determined to be fair and reasonable in 2009.[22]  AR at 97.  The only figures in the administrative record regarding the last option year of Harris's old contract show that the annual cost of the CMAS contract from October 1, 2008 through September 30, 2009 was $403,338.40.  AR at 16.  In contrast, the cost of a six to ten month transition to a

---

[21]/  The contract specialist also failed to complete adequate market research, as evidenced by her memorandum dated May 12, 2010.  AR at 70.  According to plaintiff, even the minimal research performed by the contract specialist, or a simple check of the CMAS contract file, would have produced information regarding IDEA's experience with CMAS.  Pl.'s Mot. ¶ 8.

[22]/  At least one of Harris's prices for the sole-source contract was not comparable to the old contract.  The sole-source contract contained an expansive increase in the amount budgeted for contractor travel.  *See supra.*

new contractor was estimated in the J&A to be $1,500,000.[23] *Id.* at 96. This figure is unexplained, other than an assertion that it is based on "current labor rates." *Id.* There is no credible explanation in the record for this estimate, which triples the annual cost of the contract, to explain a transition period of approximately six to ten months. Based on the facts in the record, the agency's reliance on its calculations as to the "substantial duplication of costs" of the transition to a new contractor is arbitrary and capricious.[24]

## C.   Violations of Procurement Regulations

### 1.   Overview

The violations of procurement regulations in the sole-source award to Harris are numerous, troubling and prejudicial to IDEA. These are not mere technical errors. Although there is no indication that the Air Force conducted this procurement in bad faith, the record suggests that compliance with regulatory mandates was needlessly sacrificed so that a contract vehicle could be put in place with a minimum amount of effort. The cumulative effect of these regulatory violations was to frustrate full and open competition for the CMAS support services requirement.

### 2.   Reliance on FAR 6.302-1 *and* FAR 6.302-2

The two types of authority for sole-source procurements at issue in this protest are "only one responsible source" authority, FAR 6.302-1, and "unusual and compelling urgency" authority, FAR 6.302-2. Although the FedBizOpps notice confirmation identifies only FAR 6.302-1 as authority, AR at 101, the text of the J&A relies on both FAR 6.302-1 and FAR 6.302-2 for authority, AR at 96. The

---

[23]/ The court notes that it is not unusual for an incoming contractor to hire some or all of the incumbent contractor's experienced staff – in such a scenario transition periods and costs can be greatly reduced.

[24]/ The contract specialist's price reasonableness determination, conducted after the J&A was approved, was also less than persuasive. *See supra.* Even if FAR 13.106-3(a)(2), which governs price reasonableness determinations when only one bid has been received, was not violated here, the court finds that the J&A's conclusion that the price of Harris's bridge contract was "fair and reasonable," AR at 97, is significantly undermined by inaccurate assumptions and illogical reasoning.

court notes that reliance on both of these provisions as authority for a sole-source procurement J&A is extremely rare, at least in procurements protested to the GAO or this court. In fact, the court is not aware of another J&A which has attempted to rely on both of these statutory authorities for the same sole-source award.[25]

The simple reason that this is such a rare circumstance is that the FAR forbids reliance on FAR 6.302-1 when FAR 6.302-2 is applicable. *See* FAR 6.302-1(b) ("This authority . . . shall not be used when any of the other circumstances [in FAR sections 6.302-2, 6.302-3, 6.302-4, 6.302-5, 6.302-6] is applicable."); *ATA Defense*, 38 Fed. Cl. at 497-98 (noting that a contracting officer may not justify a sole-source award under FAR 6.302-1 if FAR 6.302-2 also applies). In other words, if a contracting officer is faced with a situation which can be addressed by applying the "unusual and compelling urgency" provisions of FAR 6.302-2, he or she may not rely on the "only one responsible source" provisions of FAR 6.302-1 to justify a sole-source award. One logical reason for this prohibition is that under FAR 6.302-2, the government is permitted in appropriate circumstances to "limit [but not automatically reduce to one] the number of sources from which it solicits bids or proposals." FAR 6.302-2(a)(2); *see also* FAR 6.302-2(c)(2) ("This statutory authority requires that agencies shall request offers from as many potential sources as is practicable under the circumstances."). Under FAR 6.302-1, however, the government is permitted in appropriate circumstances to solicit an offer from one source only. *See* FAR 6.302-1(b)(1). In essence, the prohibition in FAR 6.302-1(b) forces the agency to solicit offers from as many sources as is practicable, in situations of unusual and compelling urgency, before resorting to soliciting offers from only a single source, in circumstances which may also present unusual and compelling urgency.

---

[25]/ The rarity of this error would tend to support an inference that the inclusion of FAR 6.302-2 in the J&A was a scrivener's error. *See supra* note 16. The court here reviews the record that was before the agency at the time of the sole-source award, to determine whether the agency's rationale for its award decision was reasonable and consistent with procurement regulations. To this end, the court has examined the J&A under any and all of these scenarios: (1) the award relied upon the authority of FAR 6.302-1; (2) the award relied upon the authority of FAR 6.302-2; and (3) the award relied upon the authority of *both* FAR 6.302-1 *and* FAR 6.302-2. The award was not reasonable under any of these scenarios; the award also violates procurement regulations under each of these scenarios.

The court concludes that the Air Force's apparent attempt to rely on both FAR 6.302-1 and FAR 6.302-2 for the sole-source award to Harris violates FAR 6.302-1(b). Such an approach shows a disregard for the regulatory framework governing sole-source awards, and also demonstrates a disregard for one of the goals of CICA, which is to obtain as much competition as is practicable under the circumstances. The violation of FAR 6.302-1(b) would be less serious if the Air Force had strictly observed the procedural requirements of FAR 6.302-1, and had reasonably ascertained that only Harris could provide CMAS support services. The record shows, however, that neither the letter nor the spirit of FAR 6.302-1 was respected in the award of the sole-source contract to Harris. Furthermore, the Air Force similarly failed to respect the safeguards in FAR 6.302-2 which ensure that the "unusual and compelling urgency" justification for sole-source awards is not abused. The violation in the J&A of FAR 6.302-1(b), if not a scrivener's error, was significant.

### 3. No Market Research, as Required by FAR Part 10

If, as it appears, the Air Force's primary justification for the sole-source award was its determination that Harris was the one responsible source for CMAS support services, such a determination, to be rational, required adequate market research. As discussed *supra*, the Air Force did not conduct any significant market research. As the contract specialist conceded, the lack of market research to support this sole-source procurement violates FAR Part 10. AR at 70.

The specific provisions in FAR Part 10 that have been violated here, in the court's view, include FAR 10.001(a)(2)(ii), FAR 10.001(3)(i), and FAR 10.002(b). These provisions require market research if the contract is valued to exceed a threshold amount, require market research that identifies potential sources for the contract requirement, and require market research into the availability of commercial items. The record before the court does not show that the Air Force satisfied the market research requirements of FAR Part 10. The failure to conduct adequate market research also implicates FAR 6.302-1(b)(1), which requires a "reasonable basis" for the determination that only one responsible source exists to fulfill a contract requirement. *See, e.g.*, *WorldWide Language*, 2005 WL 3143870, at *12 (sustaining a protest of a sole-source award justified by the authority of FAR 6.302-1 because "firms other than [the incumbent] and their capabilities were simply not meaningfully considered"). The violation of FAR Part 10 in this procurement was a significant and serious violation of procurement regulations.

25

### 4. No Contract Synopsis Posted, as Required by FAR 5.207(c)(15)(ii) and FAR 6.302-1(d)(2)

As a general rule, a procuring agency must provide notice of upcoming contract actions. *See* FAR 5.201(c) ("The primary purposes of the notice are to improve small business access to acquisition information and enhance competition by identifying contracting and subcontracting opportunities."). These contract action synopses are required to include specified content. FAR 5.207. As pertinent here, "[w]hen using the sole source authority at 6.302-1, insert a statement that all responsible sources may submit a capability statement, proposal, or quotation, which shall be considered by the agency." FAR 5.207(c)(15)(ii) (now found at 48 C.F.R. § 5.207(c)(16)(ii)). The requirement for this statement in a posted synopsis is also found in FAR 6.302-1, which contains the additional requirement that "any bids, proposals, quotations, or capability statements [received in response to the synopsis] must have been considered" by the agency. FAR 6.302-1(d)(2).

Here, there was no synopsis posted prior to contract award; no statement encouraging potential sources to submit proposals; and, necessarily, no consideration by the Air Force of information received in response to such a notice. The failure to post a proper synopsis on FedBizOpps was a significant departure from regulatory requirements, and further weakens the rationality of the agency's determination that only Harris could have performed the bridge contract for CMAS support services. *See, e.g.*, *M.D. Thompson Consulting, LLC*, B-297616, 2006 CPD ¶ 41, 2006 WL 463154, at *3 (Comp. Gen. Feb. 14, 2006) (stating that "a synopsis must provide prospective alternative sources a meaningful opportunity to demonstrate their ability to provide what the agency seeks to purchase") (citation omitted); *see also Barnes Aerospace Grp.*, B-298864, 2006 CPD ¶ 204, 2006 WL 3849071, at *6 (Comp. Gen. Dec. 26, 2006) ("We think agencies undercut their credibility when they prepare and execute sole-source J & As on the basis that there is only one responsible source available, before the time they have received expressions of interest and capability from potential offerors. The entire purpose of issuing notices seeking expressions of interest and capability is to avoid the need for such sole-source procurements, if possible."). The sole-source award to Harris was not in accordance with FAR 5.207(c)(15)(ii) or FAR 6.302-1(d)(2) and was improper for this reason.

**5.      No Explanation in the J&A as to the Failure to Post a Synopsis, and No Citation to Authority Justifying Such a Failure, as Required by FAR 6.303-2(a)(6)**

There are exceptions to the requirement for the posting of a contract action synopsis, and these exceptions are delineated in FAR 5.202.  One such exception permits an agency to refrain from posting a contract action synopsis for a sole-source award justified under FAR 6.302-2 when certain conditions are met:

> The contracting officer need not submit the notice required by [FAR] 5.201 when . . . [t]he proposed contract action is made under the conditions described in 6.302-2 . . . and the Government would be seriously injured if the agency complies with the time periods specified [for the posting of contract action synopses] in [FAR] 5.203.

FAR 5.202.  Thus, a sole-source award justified under FAR 6.302-2 may, in appropriate circumstances, be exempt from the synopsis requirements set forth in FAR Subpart 5.2.

However, the above-mentioned exception in FAR 5.202 was not invoked in the J&A for this sole-source procurement; indeed, the J&A is silent as to the Air Force's failure to post a synopsis before contract award.  The J&A thus fails to conform to FAR 6.303-2, which requires that each J&A include "[a] description of efforts made to ensure that offers are solicited from as many potential sources as is practicable, including whether a notice was or will be publicized as required by subpart 5.2 and, if not, which exception under 5.202 applies."  FAR 6.303-2(a)(6) (now found at 48 C.F.R. § 6.303-2(b)(6)).  This is not a mere technical error - the officials approving the J&A should have been made aware of the Air Force's failure to synopsize the contract action (and the ramifications that failure might have had on the rationality of the sole-source award); in the absence of this vital information, their approval signatures do not carry the same weight.  *See United States Marshals Serv.*, B-224277, 87-1 CPD ¶ 430, 1987 WL 102234, at *1 (Comp. Gen. Apr. 22, 1987) (finding a sole-source award improper because the agency's J&A did not contain a statement noting and explaining the agency's failure to post a synopsis prior to award).  For this reason, the Air Force's sole-source award to Harris violated FAR 6.303-2(a)(6) and was improper.

### 6. No Mention of IDEA as an Interested Source, as Required by FAR 6.303-2(a)(10)

Another minimum requirement of a sole-source J&A is a listing of contractors that have expressed an interest in the contract requirement. This requirement is set forth in FAR 6.303-2, which states in relevant part: "As a minimum, each justification shall include . . . [a] listing of the sources, if any, that expressed, in writing, an interest in the acquisition." FAR 6.303-2(a)(10) (now found at 48 C.F.R. § 6.303-2(b)(10)). This regulation, too, was violated in the sole-source award to Harris.

Here, it is undisputed that IDEA repeatedly expressed, in writing, an interest in the CMAS procurement, in emails sent February 9, 2009, March 24, 2009, April 17, 2009, and December 11, 2009. These expressions of interest were received despite the agency's failure to post a synopsis of the upcoming sole-source award to Harris. In the circumstances of this procurement, where Mr. Crain and IDEA had extensive CMAS experience and contacts with officials responsible for CMAS, these written expressions of interest by IDEA should have earned IDEA an "Interested Source" listing in the J&A, but did not.

If, indeed, IDEA's interest in the CMAS contract requirement had been noted in the J&A, it is likely that a more thoughtful analysis of the agency's "only one responsible source" determination would have been conducted by the approving authorities. As the record stands, however, there is no useful comparison of the qualifications of IDEA and Harris in the record. The court finds that the violation of FAR 6.303-2(a)(10) was significant.

### 7. Failure to Solicit Offers from As Many Sources As Practicable, as Required by FAR 6.302-2(c)(2)

Finally, even if this sole-source procurement had been justified only under the "unusual and compelling urgency" circumstances described in FAR 6.302-2, the Air Force did not make the required effort to solicit offers from as many sources as practicable. FAR 6.302-2(c)(2). The GAO has repeatedly sustained protests where an agency has made only minimal efforts to expand its consideration of potential sources beyond an incumbent contractor. The following passage in *WorldWide Language* describes a flawed procurement not unlike the sole-source procurement in this case:

Moreover, the actions associated with the J & A were inconsistent with the requirements of the "unusual and compelling urgency" justification ultimately relied upon by the agency as the basis for the sole-source award to [the awardee]. When relying on the urgency justification, as noted above, an agency is required to obtain competition to the maximum extent practicable. However, as a consequence of the agency's focus on the capabilities of [the awardee] to the exclusion of all others, the agency failed to take any steps to obtain any competition for the expanded . . . requirement. For example, in testimony before our Office regarding the consideration of other contractors, the Air Force indicated that due to the short time frame to fulfill the requirement, transition issues, and because [the awardee] was "performing admirably [on an existing contract]," the Air Force determined that [the awardee] "was uniquely qualified to be the source on this follow-on." The record shows that the expanded . . . requirement was formally approved by the Under Secretary of Defense on May 2, 2005 and [the awardee's] sole-source contract was ultimately awarded in late July – but during that entire period no effort was apparently made to identify other firms, consider their capabilities or provide for any degree of competition, even on a limited basis. In addition, while it may be the case that [the awardee's] customers in Iraq were pleased with [the awardee's] performance, their satisfaction did not provide a basis for disregarding the requirement to seek competition to the maximum extent practicable. As a consequence, we sustain the protesters' challenge to the second sole-source award to [the awardee].

*WorldWide Language*, 2005 WL 3143870, at \*12 (citations and footnotes omitted).

In this case, the Air Force neglected to look into its own contract files to discover IDEA, a potential competitor to Harris, as a source for CMAS services; neglected to post a synopsis which might have produced expressions of interest from competitors to Harris; and performed only the most cursory searches for contractors

29

capable of fulfilling the CMAS bridge contract. As in *WorldWide Language*, the Air Force failed to solicit offers from as many sources as was practicable under the circumstances. This is a clear violation of FAR 6.302-2(c)(2). At a minimum, the agency could have solicited an offer from IDEA. *See, e.g.*, *Bausch & Lomb, Inc.*, B-298444, 2006 CPD ¶ 135, 2006 WL 2711794, at *2 (Comp. Gen. Sept. 21, 2006) (sustaining a protest because "the agency has not reasonably demonstrated why it could not have opened the requirement up to an expedited limited competition among those firms that had expressed interest in the acquisition").

Although the government, during the course of this protest, has suggested that IDEA was not a qualified, responsible source for CMAS support services, the record is devoid of any assessment of IDEA's qualifications by the Air Force. The glowing description of Harris's capabilities in the J&A permits the inference that the agency considered Harris to be superior to any potential competitor. Superiority, however, is not adequate justification for a sole-source award. *See, e.g.*, *Savantage Fin. Servs., Inc. v. United States*, 81 Fed. Cl. 300, 308 (2008) (citing *Aero Corp. v. Dep't of the Navy*, 540 F. Supp. 180, 208 (D.D.C. 1982)). Superiority, instead, permits an agency to award a contract after the evaluation of competing proposals. *Id.* (citation omitted). On the record before the court, there is no reasonable explanation why the Air Force did not solicit a proposal from IDEA.

## VII. Prejudice to IDEA

Prejudice, in the context of a bid protest of a sole-source award where violations of procurement law have occurred, may be shown in one of two ways:

> A disappointed party can establish prejudice either by showing: (1) proceeding without the violation would have made the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational, and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award; or (2) proceeding without the violation, the complaining party would have a substantial chance of receiving the sole-source award.

*Emery Worldwide*, 264 F.3d at 1086 (citations omitted). Plaintiff largely focuses on the first type of prejudice, *i.e.*, that IDEA would have had a substantial chance of

winning the CMAS contract in 2010 if a CMAS contract had been the subject of full and open competition.  Pl.'s Reply at 10.  Defendant asserts that IDEA failed to establish prejudicial error, Def.'s Reply at 8, but the court disagrees.

As discussed in this opinion, the decision to award a sole-source contract to Harris in 2010 involved a lack of advance planning, irrational reasoning, and numerous violations of procurement law and regulations.  These errors render the award to Harris irrational.  *Emery Worldwide*, 264 F.3d at 1086.  IDEA, according to the record before the court, given its experience with CMAS and its ability to staff CMAS support services with experienced subcontractors, had a substantial chance of winning a competition for a CMAS contract.  Plaintiff has shown prejudice of the first type.  *Id.*

The record also supports the existence of prejudice of the second type.  In February and March of 2010, as the agency contemplated the scheduled termination of Harris's CMAS contract on March 31, 2010, the Air Force could have conducted a limited competition for a bridge contract to maintain CMAS services, perhaps in accordance with FAR 6.302-1(b)(1)(ii) or FAR 6.302-2(c)(2).  In this scenario, IDEA, afforded the opportunity to respond to the required notices, would have had a substantial chance of winning the CMAS sole-source bridge contract.  Thus, the record before the court establishes prejudice of the second type as well.  *Emery Worldwide*, 264 F.3d at 1086.  Because IDEA has established prejudice, IDEA is entitled to bid preparation costs, if these costs are justified under the circumstances and substantiated.[26]

## VIII.  Other Protest Grounds

Because plaintiff has succeeded in its challenge to the sole-source award to Harris (Count I of the  complaint), and in establishing prejudice from that flawed procurement decision, the court need not discuss plaintiff's other contentions of error in great detail.  The court notes that defendant moves to dismiss plaintiff's other contentions of error, found in Counts II-IV of the complaint, for lack of jurisdiction.  Def.'s Mot. at 9-10.  Defendant also moves to dismiss Count IV for

---

[26]/  Plaintiff has conceded that no effective injunctive relief is available at this point in time.  Compl. ¶ 72; Pl.'s Resp. at 5-6.

failure to state a claim upon which relief may be granted, under RCFC 12(b)(6). *Id.* at 10.

Plaintiff has not offered any significant rebuttal to defendant's arguments for dismissal of Counts II-IV of the complaint, and instead asks that Counts II-IV be dismissed without prejudice, if they must indeed be dismissed. Pl.'s Resp. at 11. Plaintiff states that its request for dismissal without prejudice would permit "IDEA . . . to refile those counts in a federal district court with wider scope in its jurisdiction." *Id.* Defendant has stated that it would "request an opportunity to respond" to a formal request for dismissal without prejudice of Counts II-IV. Def.'s Reply at 7 n.4.

In these circumstances, where plaintiff has not met its burden to show jurisdiction over Counts II-IV of the complaint, dismissal is warranted. In this court, dismissal for lack of jurisdiction is typically without prejudice. IDEA thus will retain its right to file its claims elsewhere, or even refile these claims in this court; in the court's view, however, such filings would be futile. Because, in the court's estimation, further litigation of these claims has no apparent prospect for the award of relief, monetary or otherwise, the court will briefly discuss Counts II-IV of the complaint here.

### A. Count II

Count II of the complaint suggests that the Air Force violated procurement regulations when it ignored IDEA's agency-level protest. Plaintiff has alleged jurisdiction only under § 1491(a) for Count II. Compl. ¶¶ 15, 26. The court agrees with defendant, Def.'s Mot. at 9, that jurisdiction under § 1491(a) does not lie for Count II.

The court notes, however, that § 1491(b) confers a wide grant of jurisdiction to this court over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b). If Count II were refiled in this court, with jurisdiction alleged under § 1491(b), it might survive defendant's jurisdictional challenge. *See ES-KO, Inc. v. United States*, 44 Fed. Cl. 429, 431-32 (1999) (asserting jurisdiction under § 1491(b) over an alleged violation of a procurement regulation in an agency's response to an agency-level protest). However, it is extremely doubtful that the claim asserted in Count II would succeed.

This court may not substitute its judgment for that of an agency, as long as the agency's application of the relevant regulations is reasonable. *Honeywell*, 870 F.2d at 648. Although Mr. Crain's May 2010 emails to the Air Force might have been interpreted as timely agency-level protests, they also could have been interpreted as attempts to achieve "open and frank discussions" under FAR 33.103(b). Under this reasonable application of the regulation, IDEA did not file a timely agency-level protest in May 2010, and no violation of procurement regulations occurred when the Air Force failed to respond to an untimely agency-level protest filed on July 9, 2010. Count II, in the court's view, would not succeed on the merits.

## B. Count III

In Count III of the complaint, plaintiff challenges the litigation conduct of the Air Force during IDEA's GAO protest. Plaintiff has alleged jurisdiction only under § 1491(a) for Count III. Compl. ¶¶ 15, 26. The court agrees with defendant, Def.'s Mot. at 9, that jurisdiction under § 1491(a) does not lie for Count III. Even if Count III were refiled in this court alleging jurisdiction under § 1491(b), jurisdiction is, at best, doubtful. Furthermore, even if IDEA could overcome a jurisdictional challenge from defendant, the court sees no violation of procurement laws or regulations in the litigation conduct of the Air Force. The claim set forth in Count III, too, would, in all likelihood, fail on the merits.

## C. Count IV

In Count IV of the complaint, plaintiff suggests that the six-month extension of Harris's bridge contract was improper. Plaintiff has alleged jurisdiction only under § 1491(a) for Count IV. Compl. ¶ 26. Jurisdiction under § 1491(a) does not lie for Count IV.

If Count IV were refiled in this court, with jurisdiction alleged under § 1491(b), Count IV might survive a jurisdictional challenge by defendant. *See Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (stating that "a narrow application of section 1491(b)(1) does not comport with the statute's broad grant of jurisdiction over objections to the procurement process," and noting that the procurement process starts with the determination of a need and ends with contract closeout) (citations omitted). But even if jurisdiction for Count IV lies under § 1491(b), this claim still, in all likelihood, would not succeed. Plaintiff's arguments are not persuasive as to an improper contract

extension, because the bridge contract included within its terms an option for a six-month extension of contract services.  AR at 82.  In other words, Count IV appears to fail to state a claim upon which relief can be granted, and would be subject to dismissal pursuant to RCFC 12(b)(6).  *See* Def.'s Mot. at 10.

### D.  Futility

The court is unaware of any other court which would provide IDEA relief for the claims expressed in Counts II-IV of the complaint.  Dismissal without prejudice is thus of little apparent benefit to IDEA.  Refiling these claims in this court would appear to be futile, and filing these claims in another court would also appear to be futile.  Although the court cannot and does not reach the merits of these claims, plaintiff may wish to reconsider the advisability of investing further resources in the advancement of the claims stated in Counts II-IV of the  complaint.

## IX.  Relief

Plaintiff has requested bid preparation costs, as well as attorney fees.[27] Compl. ¶ 81(E)-(F).  Defendant argues that absent an invitation to bid, bid preparation costs are not available to a protestor.  Def.'s Mot. at 20.  The court reserves the question of whether a prevailing plaintiff in IDEA's circumstances may recover bid preparation costs, and whether IDEA can substantiate its bid preparation costs, for additional briefing.  As for attorney fees, defendant argues that "IDEA has not advanced any . . . theory under which it is entitled to recover these costs."  *Id.* at 11.  The court will not address the attorney fees issue unless IDEA advances an appropriate theory for an award of attorney fees, at the appropriate time.

Finally, the court notes that IDEA has requested a declaratory judgment that the sole-source award to Harris was "erroneous, unsupported by fact, and contrary to law."  Compl. ¶ 81(A).  Such a declaratory judgment, when a contract has been fully performed, is a purely academic exercise, and is not proper.  *See, e.g.*, *LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 576 (2005) (holding that when "a declaratory judgement . . . would have no practical effect on the parties,"

---

[27]/  In the same paragraph as plaintiff's request for bid preparation costs, IDEA requests protest costs for proceedings before the Air Force and before the GAO.  The court is unaware of any authority which would allow IDEA to recover such costs in this suit, and plaintiff has failed to cite the court to any such authority.

the court could not issue such a judgment (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed. Cir. 2004))).  The court must not issue a declaratory judgment in the circumstances presented here, because a declaratory judgment would have no practical effect on either the Air Force or IDEA.

## CONCLUSION

IDEA has prevailed on the merits of its bid protest.  Although bid preparation costs are normally available to a prevailing protestor, defendant challenges such an award in the particular circumstances of this case.  The court encourages the parties to resolve the bid preparation costs issue amicably, preferably by stipulation as to an amount due plaintiff.  If such a resolution is not achieved, plaintiff must file a motion and accompanying brief in support of IDEA's request for bid preparation costs.  The court also encourages the parties to explore and address the issue of attorney fees in advance of any necessity to litigate that issue, as well.

Accordingly, it is hereby **ORDERED** that

(1)     Plaintiff's Motion for Judgment on the Administrative Record, filed July 25, 2012, is **GRANTED in part**, as to Count I of the complaint, and **DENIED in part**, as to Counts II, III and IV of the complaint;

(2)     Defendant's Motion to Dismiss, Or, in the Alternative, Cross-Motion for Judgment upon the Administrative Record, filed August 24, 2012, is **DENIED in part**, as to Count I of the complaint, and **GRANTED in part**, as to Counts II, III and IV of the complaint;

(3)     The Clerk's Office is directed to **DISMISS** Counts II, III and IV of the complaint without prejudice, for lack of jurisdiction;

(4)     The parties shall **CONFER** and attempt a resolution of plaintiff's requests for bid preparation costs and attorney fees; and,

(5)     Defendant shall **FILE** a **Notice** as to the results of their negotiation by **March 1, 2013**.

/s/Lynn J. Bush

LYNN J. BUSH

Judge